SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE
NEW YORK 10036-6522
———
TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
—
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

DIRECT DIAL
(212) 735-3792
DIRECT FAX
(917) 777-3792
EMAIL ADDRESS
Christopher.Malloy@SKADDEN.COM

February 7, 2014

**VIA ECF**

The Honorable Paul G. Gardephe
United States District Judge
United States District Court
  for the Southern District of New York
500 Pearl Street, Room 920
New York, New York 10007

RE:   *Landesbank Baden-Württemberg, et al. v.*
      *RBS Holdings USA Inc., et al.*, 12-CV-5476

Dear Judge Gardephe:

       We represent defendants RBS Holdings USA Inc., RBS Securities Inc., RBS Acceptance Inc. and RBS Financial Products Inc. (collectively, "Defendants") in the above-referenced action.  We write in connection with Defendants' pending motion to dismiss to bring to the Court's attention two recent decisions: (i) *Deutsche Zentral-Genossenchaftsbank AG v. HSBC North America Holdings, Inc. ("DZ Bank")*, No. 12 Civ. 4025, 2013 WL 6667601 (S.D.N.Y. Dec. 17, 2013) (attached as Exhibit A); and (ii) *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig. ("Countrywide")*, Nos. 2:11-ML-02265-MRP (MANx), 2:11-CV-10549-MRP (MANx) (C.D. Cal. Jan. 7, 2014) (attached as Exhibit B).

       A.    ***DZ Bank***

       The court in *DZ Bank* dismissed in its entirety a complaint that is virtually indistinguishable from the Complaint here. In particular, the plaintiffs in that case brought claims against sponsors, depositors and underwriters for common law fraud, fraudulent concealment, aiding and abetting fraud, negligent misrepresentation and rescission based on mutual mistake in connection with the sale of residential mortgage-backed securities ("RMBS").  2013 WL 6667601, at *16-23.

Hon. Paul G. Gardephe
February 7, 2014
Page 2

*First*, the court in *DZ Bank* dismissed claims for negligent misrepresentation and fraudulent concealment because, as here, the plaintiffs failed to plead a "special relationship." *DZ Bank*, 2013 WL 6667601, at *16.[1]

*Second*, the court dismissed all claims arising from the defendants' alleged failure to properly transfer loans to the trusts – including claims for fraud, negligent misrepresentation and rescission based on mutual mistake – because the Pooling and Servicing Agreements ("PSAs") for the RMBS at issue did, in fact, "effectuate transfer" as a matter of law. *Id.* at *16-18. The PSAs for the deals at issue in this case, which contain materially identical language as those in *DZ Bank*,[2] likewise effectuated transfer of the mortgage loans.[3]

*Lastly*, the court dismissed all remaining fraud claims because the plaintiffs failed to plead scienter with the requisite particularity. *DZ Bank*, 2012 WL 6814194, at *18-22. In so doing, the court rejected the core theories of intent upon which Plaintiffs rely here, including allegations concerning (i) post-hoc reviews of the mortgage loans; (ii) Defendants' due diligence; (iii) Defendants' purported motive to become a "prominent player" in the RMBS market; (iv) Defendants' alleged affiliation with an originator or originators; (v) Defendants' practice of negotiating discounts on loans; and (vi) third-party diligence, including a "trending" report prepared by Clayton Holdings LLC. *DZ Bank*, 2012 WL 6814194, at *19-21.[4]

---

[1] (Defs.' Mem. of Law in Support of Mot. to Dismiss at 41-43, ECF No. 12 ("Defs.' Br."); Defs.' Reply in Further Support of Mot. to Dismiss at 19, ECF No. 15 ("Defs.' Reply Br.").)

[2] *Compare DZ Bank*, 2012 WL 6814194, at *17, *with* Exhibit G to the Declaration of Christopher P. Malloy, dated December 14, 2012, at 59, ECF No. 13-7.

[3] (Defs.' Br. at 32; Defs.' Reply Br. at 13.)

[4] Although the court in *DZ Bank* held that the German statute of limitations had not accrued by the close of 2008, it principally faulted the defendants for failing to demonstrate that the plaintiffs should have had knowledge of the defendants' intent to defraud by then. *Id.* at *13. But in this case, unlike in *DZ Bank*, Defendants have cited to German press reports from as early as 2007 indicating that "German banks including Sachsen LB 'are arguably already thinking of approaching US courts to seek compensation' because the issuers of securitizations 'induced [Sachsen LB] to purchase *by intentionally false and misleading statements.*'" (Defs.' Br. at 12 (emphasis added).) Defendants have also cited pre-2009 articles concerning Defendants' securitization practices. (*Id.* at 14.) Accordingly, to the extent that Plaintiffs here can state a claim for fraud (they cannot) – including meeting their

Hon. Paul G. Gardephe
February 7, 2014
Page 3

B.      *Countrywide*

The court in *Countrywide*, which denied a motion to reconsider its prior order dismissing fraud claims against RMBS underwriter-defendants, likewise rejected allegations concerning Clayton due diligence reports as insufficient to plead scienter. *Countrywide*, slip op. at *2. The court first held that these allegations could not support an inference of fraudulent intent where, as in this case, the complaint fails to allege "'that Clayton necessarily did diligence on any of the loans underlying the securitizations at issue . . . or provided information with respect to those loans to Defendants.'" *Id.* at *3-4 (quotation omitted) (noting that "a long line of cases [have] reach[ed] a similar conclusion" and citing cases).

But the court in *Countrywide* went a step further, casting doubt on the sufficiency of Clayton allegations regardless of whether they are tied to the relevant deals. On the motion to reconsider, the plaintiff provided new evidence demonstrating that Clayton had, in fact, performed due diligence on the loans backing one of the deals at issue. *Id.* at *5. The court nonetheless held that the "only plausible inference drawn from" the "newly discovered evidence is that most of the loans originally identified as defective were overturned because Countrywide [the originator of the loans backing the deal at issue] provided the missing information Clayton required." *Id.* at *7. The court thus concluded:

> At bottom, the due diligence process described by the new evidence— *i.e.*, the retention of a third-party due diligence firm, the iterative endeavor to provide supporting documentation to cure defects, and the copious communication which occurred amongst client, seller and due diligence vendor prior to marketing—contravenes what one expects when fraud is afoot. Accordingly, the Court finds that the evidence, even when considered collectively with the other allegations in the [complaint], fails to adequately plead scienter.

*Id.* at *7-8.

Notably, the court evaluated these allegations under the Ninth Circuit's reasonable inference of scienter test, rather than the more exacting strong inference of scienter test applied in the Second Circuit. *Id.* at *2.

*          *          *

---

burden of pleading scienter – they could have done so by the close of 2008. (Defs.' Br. at 11-16.)

Hon. Paul G. Gardephe
February 7, 2014
Page 4

       In short, *DZ Bank* and *Countrywide* further illustrate that Plaintiffs' allegations are wholly insufficient as a matter of law. Accordingly, for the reasons set forth above, as well as those explained in Defendants' motion to dismiss, the Complaint should be dismissed in its entirety with prejudice.

Respectfully submitted,

Christopher P. Malloy

cc:    All Counsel (via ECF)

Enclosures

# EXHIBIT A

Slip Copy, 2013 WL 6667601 (S.D.N.Y.)
**(Cite as: 2013 WL 6667601 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
DEUTSCHE
ZENTRAL–GENOSSENCHAFTSBANK AG, New
York Branch, d/b/a DZ Bank AG, New York
Branch; HSH Nordbank AG; HSH Nordbank AG,
Luxembourg Branch; HSH Nordbank AG, New
York Branch; and HSH Securities S.A., Plaintiffs,
v.
HSBC NORTH AMERICA HOLDINGS, INC.;
HSBC USA Inc.; HSBC Markets (USA) Inc.;
HSBC Bank USA, N.A.; HSI Asset Securitization
Corporation; HSBC Securities (USA) Inc.;
Blaylock & Company Inc.; and Blaylock Robert
Van LLC, Defendants.

No. 12 Civ. 4025(AT).
Dec. 17, 2013.

### *MEMORANDUM AND ORDER*

ANALISA TORRES, District Judge.

**\*1** HSBC North American Holdings, Inc.,
HSBC USA Inc., HSBC Markets (USA) Inc.,
HSBC Bank USA, N.A., HSI Asset Securitization
Corporation, and HSBC Securities (USA) Inc., (the
"HSBC Defendants") and Blaylock Robert Van
LLC, (collectively, the "Defendants") FN1 move to
dismiss the consolidated complaint (the
"complaint") pursuant to Rules 8(a), 9(b), and
12(b)(6) of the Federal Rules of Civil Procedure.
For the reasons stated below, Defendants' motion is
GRANTED.

> FN1. Blaylock & Company Inc. is named
> as a defendant but has not been served and
> has not appeared.

### BACKGROUND
The following facts are taken from the
complaint and accepted as true for the purposes of
this motion. *See ATSI Commc'ns, Inc. v. Shaar
Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007).

### I. *RMBS Securitization*
Residential mortgage backed-securities
("RMBS") are a type of asset-backed security
collateralized by residential mortgages. RMBS
securitization is the process by which investment
banks pool thousands of residential mortgages
together in a trust, which then issues securities in
the form of certificates to investors. The certificates
entitle the holders to a portion of the monthly
revenue stream produced by principal and interest
payments made by the mortgage borrowers. This
monthly revenue stream is overseen and managed
by the appointed trustee of each trust. Compl. ¶ 44.

The process begins when a lending institution,
also known as an "originator," makes a home loan,
secured by a mortgage, to a borrower. *Id.* at ¶ 45.
When deciding to grant a loan, originators use
underwriting guidelines to assess a borrower's
ability to repay the mortgage obligation. *Id.* at ¶
110.

The originator then sells the loans, typically in
bulk, to a separate securitizing entity, usually an
affiliate of the investment bank arranging the
securitization, called the "sponsor" or "seller." The
sponsor or seller in turn sells the loans to the
"depositor," typically also an affiliate of the same
investment bank. Both the sponsor and depositor
are considered an "issuer" of the securities. *Id.* at ¶
45.

When the issuer purchases loans from an
originator, it receives the "loan files," which
contain the underlying documentation that the
borrowers submitted in connection with their loan
applications, together with any additional
information, such as appraisals and credit
assessments. *Id.* at ¶ 46. The issuer conducts a due
diligence review of the loan files associated with
the pool of mortgages it is purchasing to ensure that
the loans were made in accordance with the stated
underwriting guidelines of the originator.
Typically, the issuer conducts the review through a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 6667601 (S.D.N.Y.)
**(Cite as: 2013 WL 6667601 (S.D.N.Y.))**

third-party vendor, such as Clayton Holdings, LLC ("Clayton") which reviewed loans for HSBC-issued securitizations. The third-party review of the loan files includes verification of, among other things, the appraised value of the home, the primary residence of the borrower, the borrower's debt-to-income ratio, the "loan documentation level," and other data. *Id.* at ¶ 47.

**\*2** The purpose of this due diligence review is to ensure that the loan pool was originated in compliance with the originator's stated underwriting guidelines. After its review, the due diligence vendor provides the issuer with a report summarizing the pool of loans that it reviewed and advises the issuer which loans complied with the underwriting guidelines and which did not. The offering documents represent that any loan that does not comply with the stated underwriting guidelines cannot be included in the securitized loan pool unless compensating factors exist. *Id.* at ¶ 48.

Based on the results of the due diligence review, the issuer determines which loans to include in the mortgage pools for each securitization and prepares offering documents describing the characteristics of the securitized loans. The issuer makes representations to investors in the offering documents concerning, among other things, the loan-to-value ("LTV") ratios [FN2] of the mortgages, the owner-occupancy status of the mortgaged properties, [FN3] the originators' adherence to underwriting guidelines, and the fact that the notes and mortgages are to be assigned to the trusts on or before the closing date. *Id.* at ¶ 49.

FN2. This ratio is an important factor in assessing the likelihood of default on a mortgage loan. The lower the LTV ratio, the more equity the borrower has in the property. A borrower with equity is less likely to risk losing it in a foreclosure, and is therefore more likely to keep mortgage payments current. Compl. ¶ 71.

FN3. Studies have shown that borrowers who actually live in mortgaged homes are significantly less likely to default on their loan obligations than borrowers with mortgages on second homes, vacation homes, and investment properties. *Id.* at ¶ 88.

According to the offering documents, once the due diligence review is complete, and prior to the issuance of the certificates, the depositor must "deposit" all of the loans into the trust by transferring and assigning each of the notes and mortgages to the trust in accordance with all applicable state and local laws. *Id.* at ¶ 50. The trust then issues certificates of varying seniority, called "tranches," which entitle the certificate-holder to receive a portion of the principal and interest payments that the borrowers make on their mortgage loans. In the event that a borrower defaults on his or her loan obligation, the trust is entitled to foreclose on the property, and distribute the sale proceeds to certificate-holders according to the priority specified in the offering documents. *Id.* at ¶ 51. The certificates are initially allocated to one or more underwriters, which identify potential investors, market the certificates to those investors based on the offering documents, and ultimately sell the certificates to the investors. *Id.* at ¶ 52.

II. *The Parties and Their Roles in the Securitization Process*

Plaintiff Deutsche Zentral–Genossenschaftsbank AG, New York Branch, d/b/a DZ Bank AG, New York Branch, ("DZ Bank") is a commercial bank incorporated in Germany. *Id.* at ¶ 26. Plaintiff HSH Nordbank AG ("HSH") is a commercial bank incorporated in Germany with twin headquarters in Hamburg and Kiel. *Id.* at ¶ 27. HSH, New York Branch and HSH, Luxembourg Branch are divisions of HSH, with offices in New York and Luxembourg, respectively. *Id.* at ¶¶ 28, 29. HSH Nordbank Securities S.A. is a wholly-owned subsidiary of HSH, with its principal place of business in Luxembourg. *Id.* at ¶ 30. They

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 6667601 (S.D.N.Y.)
**(Cite as: 2013 WL 6667601 (S.D.N.Y.))**

are collectively the "HSH Plaintiffs." DZ Bank and the HSH Plaintiffs (together, the "Plaintiffs") are investors who purchased RMBS certificates from the HSBC Defendants.

**\*3** Defendant HSBC North America Holdings, Inc. ("HSBC North America") is a Delaware financial holding company headquartered in New York. *Id.* at ¶ 31. Defendant HSBC USA Inc. ("HSBC USA") is a Maryland corporation headquartered in New York. HSBC USA is a subsidiary of HSBC North America. *Id.* at ¶ 32. Defendant HSBC Markets (USA) Inc. ("HSBC Markets") is a Delaware corporation with its principal place of business in New York. HSBC Markets is a subsidiary of HSBC North America. *Id.* at ¶ 33. HSBC North America, HSBC USA, and HSBC Markets (together, the "Parent Defendants") are each wholly-owned subsidiaries of the global parents, HSBC Holdings, and together, the Parent Defendants oversaw and controlled the RMBS operations of the remaining HSBC Defendants. *Id.* at ¶ 54.

Defendant HSBC Bank USA, N.A. ("HSBC Bank") is a United States bank chartered in Virginia, with its principal place of business in New York. HSBC Bank is a subsidiary of HSBC USA. *Id.* at ¶ 34. Defendant HSBC Securities (USA) Inc., ("HSBC Securities") is a Delaware Corporation principally located in New York. HSBC Securities is a subsidiary of HSBC Markets and an indirect wholly-owned subsidiary of HSBC USA, HSBC North America, and HSBC Holdings. *Id.* at ¶ 35. HSBC Securities was the lead underwriter for each of the RMBS securitizations at issue in this case. *Id.* at ¶ 61.

Defendant HSI Asset Securitization Corp. ("HASC") is a Delaware corporation with its principal place of business in New York. HASC is a direct, wholly-owned subsidiary of HSBC Markets and an indirect wholly-owned subsidiary of HSBC USA, HSBC North America, and HSBC Holdings. HASC was the depositor for all of the securitizations at issue in this action. HASC, as the

depositor, was also responsible for preparing and filing reports required under the Securities Exchange Act of 1934. *Id.* at ¶ 36.

Defendant Blaylock & Company Inc. ("BCI") is or was a Delaware company with its principal place of business in New York. BCI is or was a full service investment banking firm that provided underwriting services to national and international clients. BCI merged with Robert Van Securities in 2007 to form Blaylock Robert Van, LLC ("BRV"). *Id.* at ¶ 37. BRV is a limited liability company organized under the laws of California on March 26, 2007. BRV was formed as a result of a merger between BCI and BRV (together, "Blaylock"). BRV is the successor in interest to BCI. *Id.* at ¶ 38. Blaylock was a co-underwriter of the HASC 2006–OPT2 securitization along with HSBC Securities, and was the counterparty that sold the HSH Plaintiffs their certificates. *Id.* at ¶ 68.

### III. *Summary of the Action*

Plaintiffs allege misconduct on the part of the HSBC Defendants in connection with the offer and sale of certain RMBS. Plaintiffs assert causes of action for common law fraud, fraudulent concealment, or in the alternative, negligent misrepresentation, against the HSBC Defendants. Plaintiffs allege claims of aiding and abetting fraud against HSBC Securities (or alternatively, a claim for rescission based upon mutual mistake) and the Parent Defendants. Plaintiffs also assert a rescission based upon mutual mistake claim against Blaylock (or alternatively, a claim for aiding and abetting fraud).

**\*4** In 2006 and 2007, Plaintiffs purchased more than $163 million in Mortgage Loan Pass–Through Certificates (collectively, the "Certificates") in seven RMBS securitizations issued, marketed, and sold by the HSBC Defendants: HASC 2006–OPT1, HASC 2006–OPT2, HASC 2006–OPT3, HASC 2006–HE1, HASC 2006–HE2, HASC 2007–HE1, and HASC 2006–WMC1 (collectively, the "Securitizations"). *Id.* at ¶ 1. The Securitizations were purportedly backed by principal and income

Slip Copy, 2013 WL 6667601 (S.D.N.Y.)
**(Cite as: 2013 WL 6667601 (S.D.N.Y.))**

payment distributions from loan pools (the "Loan Pools") described in the registration statement, prospectus (the "Prospectus"), prospectus supplement (the "Prospectus Supplement"), and term sheet (collectively, the "Offering Documents"). The Offering Documents were prepared, distributed, and filed by the HSBC Defendants for each trust (the "Trusts"). *Id.* at ¶ 2.

Plaintiffs allege that the HSBC Defendants misrepresented the credit quality and characteristics of the Loan Pools, including appraisals (causing artificially deflated LTV ratios) and owner-occupancy rates of the mortgaged properties. *Id.* at ¶ 3. The Offering Documents also allegedly misrepresented that the underlying mortgage loans complied with specified underwriting guidelines employed by the loan originators. *Id.* at ¶ 5. The HSBC Defendants then allegedly misled the rating agencies concerning LTV ratios, owner-occupancy rates, and adherence to underwriting guidelines in order for the Certificates to receive high-investment grade ratings. *Id.* at ¶¶ 190–94. Lastly, the Offering Documents allegedly misrepresented that the loans were "mortgage-backed," because many of mortgages in the Trusts were allegedly not assigned to the Trusts at the time of securitization. *Id.* at ¶¶ 10–12. Plaintiffs allege in the alternative that if HSBC Securities and Blaylock did not know that the mortgages were not timely assigned to the Trusts, then the parties' mutual mistake entitles Plaintiffs to a rescission of the sale. *Id.* at ¶ 243.

Plaintiffs allege millions of dollars in losses on their RMBS holdings because the value of the Certificates at the time of purchase was significantly overstated due to the HSBC Defendants' misrepresentations. *Id.* at ¶ 24.

### DISCUSSION

I. *Standard of Review*

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, " 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

*Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions[ ] and a formulaic recitation of the elements of a cause of action." *Twombly,* 550 U.S. at 555. In addition, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* On a 12(b)(6) motion to dismiss, a district court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, documents possessed by plaintiffs, or documents that plaintiffs knew about and relied upon. *See Chambers v. Time Warner, Inc.,* 282 F .3d 147, 153 (2d Cir.2002). A district court considering a Rule 12(b)(6) motion must accept all factual allegations in the complaint as true, while also drawing all reasonable inferences in favor of the nonmoving party. *ATSI Commc'ns, Inc.,* 493 F.3d at 98.

**\*5** For fraud claims to survive a motion to dismiss, "a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). For a fraud claim "to comply with Rule 9(b), the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290 (2d Cir.2006) (citation and internal quotation marks omitted). A complaint alleging fraud, moreover, must plead facts that give rise to a strong inference of scienter. *S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.,* 84 F.3d 629, 634 (2d Cir.1996).

II. *New York's Borrowing Statute Requires Plaintiffs' Claims to Be Timely Under German Law*

A federal court sitting in diversity applies the laws of the forum in which it sits. *See Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938). C.P.L.R. § 202, New York's "borrowing statute," requires non-resident plaintiffs to file claims by the shorter of the statute of limitations of either (a) New York or (b)

Slip Copy, 2013 WL 6667601 (S.D.N.Y.)
**(Cite as: 2013 WL 6667601 (S.D.N.Y.))**

the jurisdiction where the claim accrued (in order to prevent forum shopping by time-barred claimants). Under New York law, tort and contract claims are deemed to accrue at the time and place of the injury. *See Global Fin. Corp. v. Triarc Corp.,* 93 N.Y.2d 525, 529–30 (1999). "In cases involving economic harm, that place is normally the state of plaintiff's residence." *Gorlin v. Bond Richman & Co.,* 706 F.Supp. 236, 240 (S.D.N.Y.1989) (citations omitted); *but see Lang v. Paine, Webber, Jackson & Curtis, Inc.,* 582 F.Supp. 1421 (S.D.N.Y.1984). Foreign corporations reside either in their principal place of business or their place of incorporation. *See Woori Bank v. Merrill Lynch,* 923 F.Supp.2d 491, 494–95 (S.D.N.Y.2013), *aff'd,* No. 13 Civ. 829, 2013 WL 6097545 (2d Cir. Nov. 21, 2013); *Oxbow Calcining USA Inc. v. American Indus. Partners,* 96 A.D.3d 646, 651 (1st Dep't 2012).

In *Lang,* the plaintiff, a resident of Canada, sued for securities fraud and breach of fiduciary duties on a brokerage account he held in Massachusetts. *Lang,* 582 F.Supp. at 1422. The court defied the place-of-residence rule and held that the plaintiff's purely economic injury accrued in Massachusetts, his "financial base," not in Ottawa where he maintained his home. *Id.* at 1426. Plaintiff DZ Bank [FN4] identifies one case in the almost thirty years since *Lang* was decided that has followed the *Lang* or "financial base" exception. [FN5] *See Salzmann v. Prudential Securities Inc.,* No. 91 Civ. 4253, 1994 WL 191855, at *5 n. 2 (S.D.N.Y. May 16, 1994) (holding plaintiffs' injury accrued in Florida, where they maintained a separate financial base and where the trading activity occurred, instead of their residence, Bolivia). Indeed, economic injury is said to occur in a location other than where the plaintiff resides only in "extremely rare case[s] where the party has offered unusual circumstances." *Robb Evans & Assocs. LLC v. Sun America Life Ins.,* No. 10 Civ. 5999, 2012 WL 488257, at *4 (S.D.N.Y. Feb. 14, 2012) (quoting *Baena v. Woori Bank,* No. 05 Civ. 7018, 2006 WL 2935752, at *6 (S.D.N.Y. Oct. 11,

2006)); *Gorlin,* 706 F.Supp. at 340 n. 8.

> FN4. The HSH Plaintiffs did not contest application of the German statute of limitations, via the New York borrowing statute, to the facts of this case. Moon Decl. Ex. G.

> FN5. In *Intellivision,* the court had already determined Connecticut to be Intellivision's principal place of business and its discussion of *Lang* was purely hypothetical. *Intellivision v. Microsoft Corp.,* 784 F.Supp.2d 356, 369 (S.D.N.Y.2011) ("Moreover, *even if* the individual plaintiffs were the true parties in interest on the claims of fraudulent misrepresentation and negligent misrepresentation, their claims *would still have* accrued in Connecticut.") (emphasis added).

**\*6** DZ Bank cites no cases where the *Lang* exception has been applied to a foreign corporation. *See Robb Evans,* 2013 WL 123727, at *1 ("Unsurprisingly, the [r]eceiver has not identified a case in which a court has applied the limited *Lang* exception to hold that a corporate entity's claims accrued outside of its principal place of business."). In *Robb Evans,* the court found that the receiver had not demonstrated that the company's circumstances were "any different than those of numerous corporate entities that maintain their residence outside of New York but generally conduct their business in the New York financial market." *Id.* Indeed, extending the *Lang* exception to non-resident corporations conducting business in New York without a showing of unusual circumstances "would allow the exception to swallow the rule and render New York's borrowing statute toothless." *Stichting Pensioenfonds ABP v. Credit Suisse Group AG,* No. 653665/2011, 2012 WL 6929336, at *3 (N.Y.Sup.Ct. Nov. 30, 2013).

In *Stichting Pensioenfonds,* a RMBS case, the court rejected the *Lang* exception even though the

Slip Copy, 2013 WL 6667601 (S.D.N.Y.)
**(Cite as: 2013 WL 6667601 (S.D.N.Y.))**

foreign corporation "purchased all the [c]ertificates at issue in the United States, with U.S. dollars drawn from U.S. bank accounts, and held them in custodian accounts in New York, managed by an investment advisor ... with a primary place of business in New York." *Id.* at *2. *See also In re Countrywide Financial Corp. Mortgage–Backed Securities Litigation,* 834 F.Supp.2d 949, 958–60 (C.D.Cal.2012)* (declining to find *Lang* exception where " '[t]he AIG employees responsible for managing Plaintiffs' portfolios and making the purchase decisions for all the RMBS at issue were located in New York, New York [and the] same employees conducted the due diligence' ") (quoting the complaint at issue). The Court must answer the sensible questions of "who became poorer and where did they become poorer?" *Baena,* 2006 WL 2935752, at *7 (citation and internal quotation marks omitted). In *Baena,* the court held that *Lang* did not apply because "the economic impact of the injury was ultimately felt ... in Belgium where the company resided." *Id.*

DZ Bank does not allege facts sufficient to support a claim of unusual circumstances here. DZ Bank argues that it maintains a financial base in New York and that DZ Bank felt losses on the Certificates almost exclusively in the New York branch. However, the information cited in support of their argument is either irrelevant to the inquiry or indistinguishable from the conduct of hundreds of other financial services companies that operate in New York, but are located abroad. In short, DZ Bank asserts that the decisions, operations, accounting, diligence, and purchases for the RMBS investments were performed in New York and/or out of New York bank accounts. DZ Bank's 'financial base' theory fails for the reasons articulated in *In re Countrywide* and the reasons set forth in *Stichting Pensioenfonds,* where the courts found no *Lang* exception even when the due diligence review was conducted in New York and the certificate purchases were carried out in New York, involving New York accounts, and the certificates were later managed in New York. *In re*

*Countrywide,* 834 F.Supp.2d at 958; *Stichting Pensioenfonds,* 2012 WL 6929336, at *2.

**\*7** Indeed, when answering the sensible questions of (1) who became poorer, and (2) where did they become poorer, the clear answers are: (1) DZ Bank AG shareholders, and (2) in Germany. Although DZ Bank argues that the New York branch suffered the losses because the branch's funds were diminished, its liquidity was reduced, and the size of its workforce was downsized, the inquiry is where "the economic impact of the injury was *ultimately* felt." *Baena,* 2006 WL 2935752, at *7 (emphasis added). Carl Amendola, Managing Director of the Treasury Department of DZ Bank's New York branch, testified that the New York branch's money started and stopped at DZ Bank AG in Germany. Amendola explained that:

1. Operation of the New York branch of DZ Bank began with a loan from DZ Bank AG in Germany, which has never been repaid. Amendola Dep. 153:21–154:15, Mar. 13, 2013.

2. Any loss realized through write-downs of the Certificates affected the net income of DZ Bank AG in Germany. *Id.* at 48:4–49:13.

3. "[The downgrades and poor performance of the Certificates] hurt the results of DZ Bank AG, the consolidated results." *Id.* at 142:8–144:3.

4. The New York branch does not have shares, does not award dividends, and to the extent the New York branch is profitable, DZ Bank AG has ultimate control over what to do with those profits. *Id.* at 45:5–25.

5. Alleged losses on the Certificates were 1.8% and 1.7% of DZ Bank AG's equity capital in 2008 and 2009, respectively. Amendola Aff. ¶ 15.

Accordingly, the Court holds that Plaintiffs sustained their injuries in Germany and, therefore, the German statute of limitations applies.

III. *The Court Must Determine Germany's Statute*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*of Limitations*

In determining foreign law, a court may "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed.R.Civ.P. 44.1. The court has broad discretion in determining what evidence to take into account and at what stage of the case to resolve questions of foreign law. *Argonaut Partnership L.P. v. Bankers Trus tee Co., Ltd., No.* 96 Civ.1970, 1997 WL 45521, at *9 (S.D.N.Y. Feb. 4, 1997) (under Fed.R.Civ.P. 44.1 the court may give an expert opinion on foreign law whatever probative value it deems warranted under the circumstances). The court may decide between conflicting expert affidavits and it may do so at the motion to dismiss stage even when the expert affidavits submitted by the parties disagree. *See Ancile Inv. Co. Ltd. v. Archer Daniels Midland Co.,* No. 08 Civ. 9492, 2012 WL 6098729, at *3–6 (S.D.N.Y. Nov. 30, 2012), *aff'd,* No. 13 Civ. 172, 2013 WL 4766856 (2d Cir. Sept. 6, 2013). The parties have presented dueling expert affidavits regarding the applicable law. The Court holds that the presentation of expert affidavits and translations of German statutes and cases on this issue have provided sufficient information to make the determination.

IV. *German Law Applies a "Gross Negligence" Standard for Tort and Contract Claims*

***8** Both experts agree that the applicable statute of limitations for all of the claims asserted in the complaint is three years, which begins to run at the end of the calendar year in which: "1. the claim arose and 2. the [plaintiff] obtains knowledge of the circumstances giving rise to the claim and of the identity of the [defendant], or would have obtained such knowledge if he had not shown gross negligence." Mansel Decl. ¶ 6 (quoting § 199(1) BGB); Nedden Decl. ¶ 23 (quoting § 199(1) BGB) (internal quotation marks omitted).

Both experts also agree on the following: The defendant has the burden of proving knowledge or grossly negligent ignorance. Mansel Decl. ¶ 7; Nedden Decl. ¶ 34. The first element ("the claim arose") is satisfied when all of the substantive elements of the claim are objectively fulfilled. Mansel Decl. ¶ 9; Nedden Decl. ¶ 24. The second element does not require that a plaintiff know every fact that might be ultimately alleged or every detail to be known. It is not necessary for any "litigation risk" to be excluded. Mansel Decl. ¶ 12; Nedden Decl. ¶ 33; Nedden Reply Decl. ¶ 11. Plaintiffs cannot deliberately shut their eyes to a practically obvious means of gaining knowledge that is readily available to them, and which would not incur considerable effort. Mansel Decl. ¶ 17; Nedden Decl. ¶ 28. The plaintiff has a duty to disclose the steps it took in order to investigate possible claims in the event that an investigation is warranted. Mansel Decl. ¶ 27; Nedden Reply Decl. ¶ 14.

The Court accepts as true the following unrebutted assertions: Where a defendant's intent is an element of the claim, such as in a fraud claim, the beginning of the limitation period requires knowledge (or grossly negligent ignorance) about those facts that indicate the defendant's intent. Mansel Decl. ¶ 13. Similarly, when fault is an element of the claim, the plaintiff must have knowledge (or grossly negligent ignorance) of facts pointing to the defendant's fault, in order to start the limitation period. *Id.* "Gross negligence requires a breach of due care that is objectively substantial and subjectively inexcusable." *Id.* at ¶ 14 (quoting the German Supreme Court) (internal quotation marks omitted). A plaintiff is grossly negligent when he "has no knowledge because he did not make obvious considerations or cast them aside or that which should have been obvious to anyone in that particular scenario must have gone unnoticed." *Id.* (quoting the German Supreme Court) (internal quotation marks omitted). For instance, "this is the case if the circumstances giving rise to the claim suggested themselves and he did not avail himself of easily accessible sources of information. [ ... The] creditor's gross negligence requires that, given the concrete case at hand, the omission to further investigate must appear wholly incomprehensible."

Slip Copy, 2013 WL 6667601 (S.D.N.Y.)
**(Cite as: 2013 WL 6667601 (S.D.N.Y.))**

*Id.* (alteration in original) (quoting the German Supreme Court) (internal quotation marks omitted). "German courts will find that a plaintiff would have obtained knowledge but for gross negligence if a plaintiff's lack of actual knowledge is the result of the plaintiff's manifest failure to exercise the degree of reasonable care expected of a prudent person in the same position." Nedden Decl. ¶ 28.

**\*9** Although both experts agree that the limitation period begins when the plaintiff had knowledge or would have had necessary knowledge had he not been grossly negligent, they disagree about how German courts apply this standard. In particular, the experts differ on the importance of certain factors in determining the plaintiff's duty to investigate, such as the relevance of a party's sophistication, the economic performance of the party's investment, the size and volume of the investments, and the types of information a party is obliged to investigate.

A. *The Duty to Investigate Generally*
Both experts acknowledge a duty to investigate. Jan Heiner Nedden ("Nedden"), Defendants' expert, states there is a duty to investigate and assessing whether it "has been breached, German courts look into the individual and specific circumstances of a given case." Nedden Decl. ¶ 28. Heinz–Peter Mansel ("Mansel"), Plaintiffs' expert, asserts: Although the plaintiff does not owe a duty to the defendant, he does have a secondary duty to protect his own interest that requires him to ask questions if the failure to do so would be incomprehensible in the given case. Mansel Decl. ¶ 16. He explains:

Even then he is only required to make simple requests that do not involve appreciable effort. A creditor only acts with gross negligence, when given the circumstances, refraining from investigation makes almost no sense. And there is ... no ... duty to undertake investigations which require appreciable effort. The creditor must only avail himself of such possibilities to investigate that are, in a manner of speaking, in plain sight.

This means, he is not allowed to deliberately shut his eyes to a practically obvious means of gaining knowledge that is readily available to him, and which would not incur considerable efforts.... The failure to investigate is only grossly negligent if the plaintiff has particular information clearly brought to his attention that renders his claim apparent and creates the suspicion that damage was caused to him by the conduct of a particular defendant and if the plaintiff has reasonable means of investigation that can easily be taken without any appreciable effort.

Mansel Decl. ¶¶ 16, 17 (footnotes omitted). Nedden does not rebut any of Mansel's assertions about the nature of the duty to investigate.[FN6] Rather, he cites articles Mansel has written that are consistent with what Mansel states in his declaration. Nedden Reply Decl. ¶¶ 18–20. However, the experts disagree about the following factors and circumstances that inform a plaintiff's duty to investigate.

> FN6. Specifically, Nedden does not rebut Mansel's assertion that: "The creditor (plaintiff) never has a duty to the debtor (defendant) to investigate to trigger an early start of the limitation period. He does not have to meet the debtor's interest and preference in an early start of the limitation period.... He only has to ask further questions to protect his own interest." Mansel Decl. ¶ 16. Rather, Nedden states that, "[e]ven accepting that, under German law, creditors do not owe a duty to *the debtor* to investigate possible claims, this does not mean that plaintiffs have no such duty. The distinction is subtle, but important." Nedden Reply Decl. ¶ 17.

B. *The Party's Sophistication*
Nedden argues that a "sophisticated plaintiff has a heightened duty to investigate possible claims. If a plaintiff is sophisticated, German

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 6667601 (S.D.N.Y.)
**(Cite as: 2013 WL 6667601 (S.D.N.Y.))**

Courts will be more inclined to conclude that a plaintiff could have obtained knowledge of the claim in the exercise of reasonable care." Nedden Decl. ¶ 31. Mansel disagrees, declaring that the rule governing grossly negligent conduct "does not distinguish between consumer or commercial creditors (plaintiffs). Even though commercial entities are expected to have a different scope of knowledge than consumers, the standard of gross negligence *itself* is always the same." Mansel Decl. ¶ 15. Nedden impeaches Mansel by offering Mansel's scholarship on the subject:

> **\*10** To divine Professor Mansel's position on this critical issue, one must look to articles he authored on this very subject that go unreferenced in his declaration. In these articles, Professor Mansel acknowledges that commercial entities are expected to know more than consumers and may be grossly negligent in failing to learn of their claims if they do not: "According to established case law, gross negligence is committed by anyone who fails to exercise the diligence required in commerce based on the total circumstances to an unusually high extent and ignores what should have been clear to any participant in the *specific group* in the specific situation. Therefore, *lesser requirements are to be made on the consumer (section 13) in this regard than on a business entity (section 14)*. In addition to this objective feature, there is the requirement that the obligee could have acknowledged and exercised the objectively required diligence based on his *individual capacities."* (Ex. 12) (emphasis added).

Nedden Reply Decl. ¶ 26. The weight of the evidence on this issue favors the conclusion that, under German law, sophisticated plaintiffs have a heightened duty to investigate possible claims. Because Mansel's prior scholarship contradicts his declaration, the Court does not find him credible on this point. Mansel also fails to rebut Nedden's assertion that: "German courts will find that a plaintiff would have obtained knowledge but for gross negligence if a plaintiff's lack of actual knowledge is the result of the plaintiff's manifest failure to exercise the degree of reasonable care expected of a prudent person in the *same position."* Nedden Decl. ¶ 28 (emphasis added). And Mansel even admits that "commercial entities are expected to have a different scope of knowledge than consumers." Mansel Decl. ¶ 15.

C. *Economic Performance of the Investment*

Nedden argues that: "It has also been held that the poor economic performance of an investment fund may create a duty of the investor to consult a lawyer. In such situation, it would be abusive to delay the commencement of the standard limitation period by failing to act. (Higher Regional Court of Frankfurt, decision of 28 May 2008, BeckRS 2008, 12069 (Exhibit 5))." Nedden Decl. ¶ 30. Mansel rebuts, stating that the case cited "does not create a duty to consult a lawyer to get the knowledge of the relevant *facts* which is mandatory to start the limitation period." Mansel Decl. ¶ 23. Rather, in that case, "[t]he court ruled that it was not necessary that the creditor had knowledge of the *legal assessment* of the facts." *Id.* "Because the creditor could have got [sic] the necessary knowledge of the law by asking a lawyer in 2001 the limitation period started ... at the end of 2001." *Id.* Thus, Mansel argues, the case merely stands for the proposition that knowledge of the underlying facts is what counts—not what legal consequences arise from the facts. Nedden rebuts, stating: "The Higher Regional Court of Frankfurt held that plaintiff's claim was time barred, explicitly noting that plaintiff should have consulted an attorney in 1999 when learning of the investment's poor economic performance." Nedden Reply Decl. ¶ 30. Mansel also cites a May 6, 2008 decision of the Higher Regional Court of Saarbrücken where the court found "no duty to further investigate and inquire by engaging an attorney." Mansel Decl. ¶ 23 (internal quotation marks omitted).

**\*11** The Court has considered all of the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 6667601 (S.D.N.Y.)
**(Cite as: 2013 WL 6667601 (S.D.N.Y.))**

evidence on this point and holds that, under German law, poor economic performance of an investment fund does not create a duty of the investor to consult a lawyer. Nedden cites only one case for this proposition and his rebuttal reveals the weakness of his position. Nedden states: "[T]he court explicitly *not[ed]* that plaintiff should have consulted an attorney in 1999 when learning of the investment's poor economic performance." Nedden Reply Decl. ¶ 30 (emphasis added). Nedden admits that the language on which he relies is at best dicta. This Court will not find a duty when Defendants' own expert can only vouch for it in speculative terms: "[T]he poor economic performance of an investment fund *may* create a duty of the investor to consult a lawyer." Nedden Decl. ¶ 30 (emphasis added).

D. *Volume of Investments*

Nedden maintains that "German courts also consider the volume of the investments and the potential economic impact of the claim on the defendant to be relevant in determining whether a heightened duty to investigate applies. (*cf.* Higher Regional Court of Saarbriicken, decision of 17 June 2008, in: BeckRS 2008, 15438[) ]." Nedden Decl. ¶ 32. Mansel distinguishes the opinion, arguing it is not an investment case. Mansel Decl. ¶ 25. In his rebuttal, Nedden quotes language from the opinion Mansel distinguished:

The legal institution of the statute of limitations is also designed to protect the debtor's freedom to dispose of funds because the debtor is not supposed to create provisions for risks from earlier transactions ad infinitum and has the right, from a certain moment in time, to defend against a claim simply because time has passed ... [t]he protection of the debtor—and in mirror image, the obligation of the creditor to investigate the facts—is all the greater, the more the given claim affects the debtor's *financial foundation* .... In sum, the creditor's subjective knowledge and experience-aside from the accessibility of the source of information, the time that has passed in

the meantime and the *financial ramifications* of the debtor's successful prosecution—are also relevant to determining the standard of gross negligence.

Nadden Reply Decl. ¶ 33 (alteration in original) (internal quotation marks omitted). Having considered all of the evidence on this point, the Court holds that, under German law, there is some relationship between the volume of the investment and the standard for determining gross negligence. Intuitively, this makes sense, as any reasonable person would be more likely to investigate a larger loss of money compared to a smaller loss. Mansel's declaration that "[i]t also has to be mentioned that I have found no judgment of the BGH which *expressly* takes into account the economic impact of [the] claim" is telling. Mansel Decl. ¶ 25 (emphasis added). Although there may not be an express holding, the dicta in OLG Saarbrucken (June 17, 2008) supports Nedden's point. However, this Court will not consider the economic impact on Defendants factor in its analysis, as Mansel has established and Nedden has all but confirmed that the duty to investigate is not a duty the plaintiff owes to the defendant, but rather a secondary duty he owes to himself. *See* Mansel Decl. ¶ 16; Nedden Reply Decl. ¶ 17.

E. *Newspapers*

**\*12** Nedden argues that "[a] plaintiff has a duty to consult sources of information accessible to him ... [and][n]ewspaper articles have been considered to be such a source of information in German jurisprudence (Higher Regional Court of Munich, decision of 22 August 2007, WM 2007, 1921 (1922)." Nedden Decl. ¶ 29. Mansel argues that a "plaintiff does not have a general secondary duty to actively monitor or investigate news paper [sic] reports, media reports, particularly such originated in a foreign country." Mansel Decl. ¶ 18. Mansel also contends that plaintiffs do "not have a secondary duty regarding the triggering of limitation periods to investigate media reports, public filings or lawsuits, particularly where the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 6667601 (S.D.N.Y.)
**(Cite as: 2013 WL 6667601 (S.D.N.Y.))**

plaintiff is an entity located in Europe and the media reports originated from US-publications and the lawsuits are brought before U.S. courts." *Id.* at ¶ 28 (footnote omitted). In rebuttal, Nedden asserts that the opinion on which Mansel relies concerned application of § 852 BGB, the old version of the statute of limitations, and not § 199 BGB, the new version, which more easily facilitates the onset of the limitation period to the detriment of the plaintiff. Nedden Reply Decl. ¶¶ 39, 40. Thus, the opinion Mansel cites is not relevant. Nedden also states that he has found no case law supporting Mansel's contention that a plaintiff located in Europe has no duty to take note of information that is contained in U.S. publications and lawsuits brought before U .S. courts. Nedden Reply Decl. ¶ 43. Nedden opines that Mansel's position is "unjustified especially ... where Plaintiffs sought out U.S. investments, there were international reports about the alleged problems with [RMBS], and Plaintiffs had a physical presence in the U.S. and reported to executives in Germany." *Id.*

The Court has considered all of the evidence on this point and holds that, under German law, newspaper articles and media reports can number among the many sources of information that plaintiffs have a duty to investigate, if the context and circumstances so warrant. Mansel's reliance on the Higher Regional Court of Berlin decision is unavailing as it addressed only the old standard contained in § 852 BGB. The same conclusion would not necessarily apply under the new standard of § 199 BGB. And indeed, any assertion that plaintiffs never have a duty to investigate newspapers belies Mansel's own assertions. Mansel acknowledges, and Nedden agrees, that Plaintiffs cannot "deliberately shut [their] eyes to a practically obvious means of gaining knowledge that is readily available to [them], and which would not incur considerable efforts." Mansel Decl. ¶ 17 (footnote omitted). *See also* Nedden Decl. ¶ 28. Newspapers and other news media reports are widely available and distributed and require minimal effort to obtain. Considering that German

courts examine the individual and specific circumstances of a given case, this Court is not persuaded by Mansel's blanket assertion that there is never a duty to look to newspapers or media. Although the Court acknowledges that U.S. newspapers and lawsuits are less accessible to German plaintiffs, that does not mean a duty to investigate them may never arise.

## V. *Applying the German "Gross Negligence" Standard to the HSH Plaintiffs and DZ Bank*

**\*13** Plaintiffs have pleaded five causes of action: common law fraud, fraudulent concealment, aiding and abetting fraud (collectively, the "fraud claims"), negligent misrepresentation, and rescission based on mutual mistake. The Court will not address the German gross negligence standard vis-a-vis the negligent misrepresentation and rescission claims, as they shall be dismissed on other grounds.[FN7] All of the fraud claims contain an element of intent to defraud, or scienter.[FN8] The defendant has the burden of proving knowledge or grossly negligent ignorance. Mansel Decl. ¶ 7; Nedden Decl. ¶ 34. Where a defendant's intent is an element of the claim, such as in a fraud claim, the beginning of the limitation period requires knowledge (or grossly negligent ignorance) about those facts that indicate the defendant's intent. Mansel Decl. ¶ 13. Defendants, therefore, bear the burden of proving that Plaintiffs knew or were grossly negligent in not knowing that the HSBC Defendants had allegedly made misrepresentations to Plaintiffs with the intent of defrauding them, by December 31, 2008.[FN9]

> FN7. Also, the Court will not address application of the statute of limitations to Plaintiffs' claims based on the untimely transfer of loans to the Trusts, as they too shall be dismissed on other grounds.

> FN8. Elements of common law fraud: (1) a material misrepresentation of a fact; (2) knowledge of its falsity; (3) an intent to induce reliance; (4) justifiable reliance by the plaintiff; and (5) damages. *Eurycleia*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 6667601 (S.D.N.Y.)
**(Cite as: 2013 WL 6667601 (S.D.N.Y.))**

*Partners, LP v. Seward & Kissel, LLP,* 12 N.Y.3d 553, 559 (2009). Elements of fraudulent concealment: (1) a relationship between the contracting parties that creates a duty to disclose; (2) knowledge of the material facts by the party bound to make such disclosures; (3) nondisclosure; (4) scienter; (5) reliance; and (6) damages. *See Energy Capital Co. v. Caribbean Trading and Fidelity Corp.,* No. 93 Civ. 8100, 1996 WL 157498, at *8 (S.D.N.Y. April 4, 1996). Elements of aiding and abetting fraud: (1) the existence of the underlying fraud; (2) knowledge of the fraud by the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the underlying fraud. *See Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co.,* 64 A.D.3d 472, 476 (1st Dep't 2009).

FN9. Plaintiffs filed two separate actions in the Supreme Court of New York, New York County, on January 31, 2012 and February 27, 2012, respectively.

Defendants have failed to meet their burden. Defendants rely heavily on news accounts, lawsuits, and investigations from 2007 and 2008 which reported that originators disregarded their underwriting guidelines. However, originators abandoning their underwriting guidelines and reports thereof say nothing about the HSBC Defendants' intent to defraud. The HSBC Defendants did not necessarily know of the originators' practice of departing from guidelines merely because the HSBC Defendants securitized the loans and sold them to Plaintiffs. Although only German law is applicable here, U.S. courts have repeatedly found that notice of an originator's abandonment of underwriting guidelines does not give plaintiffs notice of an underwriter's intent to defraud, even under the more easily satisfied "inquiry notice" standard. *See Massachusetts Mut. Life Ins. Co. v. Residential Funding Co., LLC,* 843

F.Supp.2d 191, 208 (D.Mass.2013) (news about originators' lending practices "did not discuss Defendants' practices specifically, and did not alert Plaintiff to potential fraud in any specific securitization it had purchased"); *Fed. Hous. Fin. Agency v. UBS Americas, Inc.,* 858 F.Supp.2d 306, 321 (S.D.N.Y.2012) ("The truth of the matter is that when the [plaintiff] learned of the loan originators' dubious underwriting practices says little about when [it] discovered the facts that form the basis of this complaint"); *Public Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.,* No. 09 Civ. 1110, 2011 WL 135821, at *9 (S.D.N.Y. Jan. 12, 2011) (public information regarding originators disregarding underwriting guidelines did not give plaintiffs notice about the underwriters' misstatements or omissions).

Defendants also rely on the values of the Certificates declining and downgrades of the Certificates by rating agencies in 2008. The fact that some of the Certificates were downgraded by the end of 2008 reflects the Certificates' poor performance and the rating agencies' revised view of the strength of the investments. The value declines and downgrades did not speak to why the investments were performing poorly and certainly did not disclose any fraudulent behavior or intent by the HSBC Defendants. Defendants' reliance on *Fed. Hous. Fin. Agency v. UBS Americas, Inc.,* 858 F.Supp.2d at 321 for the proposition that a downgrade to junk status is "an important event" that puts a RMBS investor on notice of potential claims is misplaced, as German courts do not apply the federal inquiry notice standard. Indeed, case law under the federal inquiry notice standard is only relevant to the extent it illuminates what information or conduct fails to put plaintiffs on notice, as it is the more easily satisfied standard.

**\*14** Also, the fact that the HSH Plaintiffs filed a lawsuit against UBS alleging that it "had 'procured ratings that overstated the true credit quality of the Notes,' and supported the allegations by reference to 'downgrade[s] by Fitch' "

Slip Copy, 2013 WL 6667601 (S.D.N.Y.)
**(Cite as: 2013 WL 6667601 (S.D.N.Y.))**

(Def.Mem.7) is irrelevant. UBS is not a party in this action. Defendants essentially request that the Court impute Plaintiffs' knowledge of fraudulent conduct by one underwriter in a completely separate action to knowledge of fraudulent conduct by all underwriters in any and all actions. Defendants' knowledge via guilt-by-association theory fails as a matter of law and as a matter of common sense. The " 'creditor's gross negligence requires that, *given the concrete case at hand,* the omission to further investigate must appear wholly incomprehensible.' " Mansel Decl. ¶ 14 (emphasis added) (quoting the German Supreme Court). Plaintiffs' knowledge of the practices of UBS proves nothing about its knowledge of the practices of the HSBC Defendants, who are unrelated to UBS, in the concrete case at hand.

Lastly, Defendants contend that, at the very least, the widely reported abandonment of underwriting guidelines, the ratings downgrades, and the losses on the Certificates all should have spurred Plaintiffs to investigate. Defendants argue that Plaintiffs' investigation supporting the allegations in the complaint could have and should have been performed in 2008, as nothing prevented Plaintiffs at the time from running the automated valuation models ("AVMs") to verify LTV ratios or from reviewing the credit reports identifying the borrowers' mailing addresses six months after origination to confirm owner-occupancy rates. Despite a sophisticated plaintiff's heightened duty to investigate and the existence of a relationship between the volume of the investment transaction and the standard for determining gross negligence, FN10 the duty to investigate under German law remains extremely low. A plaintiff "only acts with gross negligence, when given the circumstances, refraining from investigation makes almost no sense. And there is ... no ... duty to undertake investigations which require *appreciable effort"* Mansel Decl. ¶¶ 16, 17 (emphasis added) (footnotes omitted). The plaintiff "must only avail himself of such possibilities to investigate that are, in a manner of speaking, *in plain sight.* This means, he

is not allowed to deliberately shut his eyes to a practically obvious means of gaining knowledge that is readily available to him, and *which would not incur considerable efforts." Id.* at ¶ 17 (emphasis added) (footnote omitted). Although the plaintiff is not "required to conduct extensive research about the facts establishing the claim and the person of his obligor, there is the obligation to at least become informed about those circumstances for which this is possible *without effort* and *without considerable expense ...* with the result that the failure to undertake such investigations seems quite incomprehensible." Nedden Decl. Ex. 6 (emphasis added) (footnotes omitted).

> FN10. The relationship between volume of the investment transaction and the duty to investigate does not seem to lend Defendants' argument much support. Alleged losses on the Certificates were only 1.8% and 1.7% of DZ Bank AG's equity capital in 2008 and 2009. Amendola Aff. ¶ 15.

**\*15** Although Plaintiffs did have a duty to investigate newspapers—as doing so requires little effort and expense—the information that they would have found there would not have alerted them to the HSBC Defendants' alleged misrepresentations, as the headlines sounded in "Countrywide Abandons Underwriting Guidelines," not, "HSBC Securitizes Exception Loans Knowing They Did Not Contain Compensating Factors." Indeed, Defendants have failed to adduce any articles, reports, investigations, or lawsuits that Plaintiffs could have uncovered that would have revealed the HSBC Defendants' roles in the fraud.

What Defendants have put forward—Plaintiffs' running of the AVMs and checking the borrowers' mailing addresses six months after the origination of the mortgages—extends far beyond what is required under Germany's duty to investigate. Plaintiffs' investigation of the LTV ratios involved the application of AVMs to a large sampling of more than 2,300 loans from the Loan Pools to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 6667601 (S.D.N.Y.)
**(Cite as: 2013 WL 6667601 (S.D.N.Y.))**

determine the value of the underlying properties at the time the pooled loans were originated. Compl. ¶ 79. Then, Plaintiffs analyzed and compared the data to the reported weighted average LTV ratio of each Prospectus Supplement of each Certificate. *Id.* Defendants cannot be heard to say that such an investigation required no appreciable effort or considerable expense. *See* Nedden Decl. Ex. 6. The same goes for Plaintiffs' investigation of owner-occupancy rates. Plaintiffs investigated whether creditors were reporting the securitized property's address as the borrower's mailing address six months after the origination of the mortgage of over 2,400 loans sampled across each of the Trusts. Compl. ¶¶ 92, 93. Plaintiffs then analyzed and compared the data to the percentage of reported owner-occupied loans across each Prospectus Supplement for each Trust. *Id.* at ¶ 95. Plaintiffs could not have undertaken such an exercise involving the sampling, review, and analysis of thousands of loans without considerable effort and expense.

Also, Defendants have offered no means of investigation available in 2008—involving considerable effort or not—that would have revealed the HSBC Defendants' knowledge of the securitization of exception loans without compensating factors. Indeed, Plaintiffs argue they had "no ability to uncover the HSBC due diligence results, establishing that HSBC knew that the securitized loans were below standard all along; that information was only revealed to the public through the FCIC's use of congressional subpoena power in 2010." Pl. Mem. 10.

Lastly, *Phoenix Light SF Ltd. v. Ace Securities Corp.,* No. 650422/2012, 2013 WL 1788007 (N.Y.Sup.Ct. Apr. 24, 2013) only confirms this Court's analysis. Far from being "inapposite," as Defendants maintain, the case is directly on point, involving application of the German statute of limitations to RMBS investors that brought New York common law fraud claims in 2012. The defendants, like Defendants here, argued that

"plaintiffs were on notice of fraud in 2008 because information concerning the falsity of the underlying loan data was widely reported by numerous major newspapers." *Id.* at *5. The court, applying the same German statute of limitations, found that "the newspaper articles cited by defendants did not put plaintiffs on notice of defendants' alleged intent to defraud them by marketing RMBS comprised of dubious loans as investment grade assets." *Id.* Defendants' attempt to distinguish *Phoenix Light* is unavailing. The fact that "the allegations of scienter [in *Phoenix Light* ] were principally based on **internal documents** unavailable in 2008" (Def. Reply Mem. 5–6) (bold and italics in original) (citations omitted) is only relevant in determining whether plaintiffs have sufficiently pleaded allegations that state a claim for relief, not whether plaintiffs' claims are barred by the statute of limitations, a completely different inquiry.

**\*16** Accordingly, Plaintiffs' fraud claims are timely under the German statute of limitations.

VI. *Negligent Misrepresentation and Fraudulent Concealment Claims Fail for No Special Relationship*

A claim for negligent misrepresentation requires plaintiffs to demonstrate: "(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." *J.A.O. Acquisition Corp. v. Stavitsky,* 8 N.Y.3d 144, 148 (2007) (citations omitted). A claim of fraudulent concealment also requires plaintiffs to plead "a special relationship." *See Grupo Sistemas Integrates de Telecomunicacion S.A.de C.V. v. AT & T Commc'ns, Inc.,* No. 92 Civ. 7862, 1996 WL 312535, at *9 (S.D.N.Y. June 10, 1996). No special relationship typically exists between sophisticated financial institutions that negotiate agreements in arm's length transactions. *See Banque Arabe Et Internationale D'Investissement v. Maryland Nat. Bank,* 819 F.Supp. 1282, 1292–93 (S.D.N.Y.1993),

Slip Copy, 2013 WL 6667601 (S.D.N.Y.)
**(Cite as: 2013 WL 6667601 (S.D.N.Y.))**

aff'd, 57 F.3d 146 (2d Cir.1995). A plaintiff sufficiently pleads such a "special relationship" when it is shown that there was "a relationship between the parties that extended beyond the typical arm's length business transaction: defendants initiated contact with plaintiffs, induced them to forebear from performing their own due diligence, and repeatedly vouched for the veracity of the allegedly deceptive information." See Suez Equity Investors, L.P. v. Toronto–Dominion Bank, 250 F.3d 87, 103 (2d Cir.2001). Plaintiffs argue that because the HSBC Defendants possessed the loan origination and servicing files, the HSBC Defendants had superior knowledge of alleged inflated appraisals, alleged score changes from due diligence vendors, and alleged waive-ins of exception loans.

Plaintiffs have failed to establish a special relationship exists here. The parties are sophisticated and the sale of the RMBS was an arm's length transaction. The fact that the HSBC Defendants "had greater knowledge of the underlying loan files and the practices of third-party due diligence providers is not sufficient to establish a 'special relationship.' " Fed. Hous. Fin. Agency v. UBS Americas, Inc., 858 F.Supp.2d at 335, aff'd, 712 F.3d 136 (2d Cir.2013). See also MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 87 A.D.3d 287 (1st Dep't 2010). Accordingly, Plaintiffs' causes of action for negligent misrepresentation and fraudulent concealment are dismissed.

VII. *The Complaint Fails as to Claims Regarding the Untimely Transfer of Loans to the Trusts*
In support of their fraud, aiding and abetting fraud, negligent misrepresentation, and rescission claims, Plaintiffs allege that the Offering Documents contained material, false representations regarding whether the loans were timely transferred to the Trusts (Compl.¶¶ 139, 142, 182), or alternatively, Blaylock and HSBC Securities (the "Underwriter Defendants") did not know that the loans were not timely assigned to the

Trusts and the parties' mutual mistake as to the essential facts upon which the sale of the Certificates was predicated entitles Plaintiffs to rescission of the sales. Id. at ¶ 243. Section 2.01(a) of each relevant pooling and servicing agreement ("PSA") provides: "The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders ... all the right, title and interest of the Depositor in and to the Trust Fund." Moon Decl. Ex. Y, at 52. Plaintiffs argue that Section 2.01(a) did not effectuate an assignment of the notes to the Trusts because Section 2.01(b) of each PSA provides:

**\*17** In connection with the transfer and assignment of each Mortgage Loan, the Depositor has delivered or caused to be delivered to the Custodian for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:

(i) the original Mortgage Note bearing all intervening endorsements necessary to show a complete chain of endorsements from the original payee, endorsed in blank, 'Pay to the order of _____, without recourse', and, if previously endorsed, signed in the name of the last endorsee by a duly qualified officer of the last endorsee ....

*Id.* Thus, Plaintiffs contend endorsement and delivery was required to assign and transfer the notes. New York law recognizes that "[n]o special form or language is necessary to effect an assignment as long as the language shows the intention of the owner of a right to transfer it." Bank of N.Y. v. Silverberg, 86 A.D.3d 274, 280–81 (2d Dep't 2011) (citation and internal quotation marks omitted); see Chase Home Finance, LLC v. Miciotta, 101 A.D .3d 1307, 1308 (3d Dep't 2012).

In Bank Hapoalim B.M. v. Bank of America Corp., No. 12 Civ. 4316, 2012 WL 6814194 (C.D.Cal. Dec. 21, 2012), the court, applying New York law, dismissed similar claims that the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 6667601 (S.D.N.Y.)
**(Cite as: 2013 WL 6667601 (S.D.N.Y.))**

mortgage notes were not properly transferred to the trusts. The court held that the plaintiffs' argument failed as a matter of law, because the PSA itself properly transferred the loans to the trusts. The PSA at issue stated: "Each Seller, concurrently with the execution and delivery of this Agreement, hereby sells, transfers, assigns, sets over and otherwise conveys to the Depositor, without recourse, all its respective right, title and interest in and to the related Mortgage Loans." *Id.* at \*8 (internal quotation marks omitted).

As in *Bank Hapoalim,* Plaintiffs' argument that the loans were not properly transferred to the Trusts is incorrect. Endorsement and delivery of notes was not "specifically required" to effectuate the transfer of ownership, as Plaintiffs contend. Rather, Section 2.01(a) effectuated transfer and Section 2.01(b) merely stated transactions that were supposed to have been consummated *"[i]n connection with* the transfer and assignment." Moon Decl. Ex. Y, at 52 (emphasis added). "Hereby" means as a result of this utterance. Thus, the language of Section 2.01(a): "hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee," unequivocally shows the intention of the owner to transfer the notes to the Trusts. *See Bank of N.Y.,* 86 A.D.3d at 280–81; *Chase Home Finance,* 101 A.D.3d at 1308. The transfer of ownership was not contingent on the delivery and endorsement of the loan files. To the extent that Section 2.01(b) of each PSA promised delivery and endorsement of the loan files before the assignment and transfer and the loan files were not delivered or endorsed, Plaintiffs' remedy is to sue "for breach of contract and breach of fiduciary duties"—claims absent from the complaint here. *Bank Hapoalim,* 2012 WL 6814194, at \*8.

**\*18** Plaintiffs' argument that although "one court dismiss[ed] similar claims, at least four other courts considering the same claims have denied defendants' motions to dismiss" (Pl.Mem.13) (citations omitted), is unavailing. In *Stichting Pensioenfonds,* 2012 WL 6929336, the court did

not even consider whether the complaint adequately pleaded a misrepresentation based on untimely transfer of loans. The other cases on which Plaintiffs rely are also inapposite, as they do not address the operative language of the PSAs at issue or apply New York law.

Lastly, Plaintiffs argue that "contractual provisions in PSAs are insufficient to transfer ownership of mortgage loans, when those same PSAs clearly and explicitly require endorsement and delivery of the notes. *See U.S. Bank N.A. v. Bresler,* 39 Misc.3d 1205(A), at \*5–6 (Sup.Ct. Kings Cnty.2013)." Pl. Mem. 15. In *Bresler,* the PSA stated: "the Depositor ... does hereby deliver ... with respect to each Mortgage Loan so transferred and assigned ... theoriginal [sic] Mortgage Note, endorsed either (A) in blank, in which the Trustee *shall* cause the endorsement to be completed." *Id.* at \*6 (internal quotation marks omitted). The PSA in *Bresler* is distinguishable in two respects. First, the operative word, "hereby," applies only to the delivery of the loans in *Bresler,* not to the transfer or assignment. And second, endorsement in *Bresler* is actually required, as evidenced by the PSA's use of "shall." Indeed, the court emphasizes "shall" in its quotation of the PSA and notes that "[t]he quoted text makes it quite clear that delivery is anticipated, but it implicitly also makes it clear that delivery is yet to be accomplished." *Id.* On the other hand, the PSAs here state, "[i]n connection with the transfer and assignment of each Mortgage Loan, the Depositor *has delivered or caused to be delivered* [the endorsed note]." Moon Decl. Ex. Y, at 52 (emphasis added). The past participle, "has delivered or caused to be delivered," reflects that delivery and endorsement are not anticipated and thus not required. Moreover, Plaintiffs' reliance on *Deutsche Bank Nat'l Trust Co. v. Haque,* No. 20236/2011, 2012 WL 2435577 (N.Y. Sup.Ct. June 20, 2012) is unavailing, as the decision does not address the language of the trust provision at issue.

Accordingly, Plaintiffs' claims of fraud, aiding

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 6667601 (S.D.N.Y.)
**(Cite as: 2013 WL 6667601 (S.D.N.Y.))**

and abetting fraud, negligent misrepresentation, and rescission regarding the untimely transfer of loans to the Trusts are dismissed.

VIII. *The Complaint Fails to Plead Scienter with Particularity*

Plaintiffs assert claims for common law fraud against the HSBC Defendants and aiding and abetting fraud against HSBC Securities and the Parent Defendants. Under New York law, the elements of common law fraud are: (1) a material misrepresentation of a fact; (2) knowledge of its falsity; (3) an intent to induce reliance; (4) justifiable reliance by the plaintiff; and (5) damages. *See Eurycleia Partners, LP,* 12 N.Y.3d at 559. The elements of aiding and abetting fraud are: (1) the existence of the underlying fraud; (2) knowledge of the fraud by the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the underlying fraud. *See Stanfield Offshore Leveraged Assets,* 64 A.D.3d at 476. A claim for common law fraud is subject to the particularity pleading requirements of Federal Rule of Civil Procedure 9(b), which requires the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner,* 459 F.3d at 290 (citation and internal quotation marks omitted). Plaintiffs are required "to plead the factual basis which gives rise to a strong inference of fraudulent intent." *O'Brien v. Nat'l Prop. Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991) (citations and internal quotation marks omitted). A strong inference of fraudulent intent " 'may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.' " *Lerner,* 459 F.3d at 290–91 (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)).

**\*19** The complaint alleges five categories of

fraudulent representations: underwriting standards, LTV ratios, owner-occupancy rates, investment ratings, and timely assignment of loans (dismissed above). The complaint does not ascribe to the HSBC Defendants any particular motive for making these fraudulent representations beyond a general profit motive common to all corporations, which does not suffice. *See Novak v. Kasaks,* 216 F.3d 300, 307 (2d Cir.2000). Plaintiffs argue that a strong inference of fraudulent intent exists based on the following allegations: The HSBC Defendants and Clayton, a third-party due diligence vendor, conducted due diligence on the loan files. Compl. ¶¶ 20, 75, 97. According to the Clayton Holdings LLC, All Clayton Trending Report: 1st Quarter 2006—2nd Quarter 2007 (2007) (the "Clayton Report"), produced during the congressional Financial Crisis Inquiry Commission (FCIC) investigation, Clayton reviewed the loan files of more than 27,000 loans for the HSBC Defendants between 2006 and mid–2007. *Id.* at ¶ 98. The report indicated that on average, approximately 26.8% of those loans received failing scores (an "event-level '3' "). *Id.* at ¶ 101. Plaintiffs allege that an "event-level '3' " indicates that the loans neither complied with the underwriting guidelines nor had compensating factors. *Id.* Nevertheless, even after the HSBC Defendants learned this information, they "waived in" 62.3% of the loans that received failing scores and ultimately included them in RMBS sold to investors. *Id.* at ¶ 103. The HSBC Defendants "waived in" failures of LTV, CLTV, and owner-occupancy standards. *Id.* at ¶ 105. The HSBC Defendants also analyzed LTV in their own due diligence reviews. *Id.* at ¶ 75. Moreover, the FCIC report indicated that issuers used the existence of underwriting exceptions to negotiate discounts for themselves when purchasing bulk loans and "Plaintiffs have no reason to believe that the HSBC Defendants deviated from this industry-wide practice." *Id.* at ¶ 104. Plaintiffs also allege that one of the originators that supplied loans for two of the Securitizations at issue, Decision One Mortgage Company, LLC ("Decision One"), was a wholly-owned subsidiary of HSBC Holdings; the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 6667601 (S.D.N.Y.)
**(Cite as: 2013 WL 6667601 (S.D.N.Y.))**

HSBC Defendants "therefore had full and unfettered access to documents about the poor credit quality and systematic underwriting deviation" of Decision One. *Id.* at ¶ 108. Lastly, Plaintiffs investigated the veracity of LTV ratios and owner-occupancy rates by running AVMs and reviewing the credit reports identifying the borrowers' mailing addresses six months after origination. *Id.* at ¶¶ 76–96. The sampled results revealed that for each Trust, the actual LTV ratios and owner-occupancy rates were between 6.5% to 13.1% higher and 15.6%) to 19.7% less, respectively, than reported in the Offering Documents. *Id.* at ¶¶ 82, 95.

Here, the pleadings do not create a strong inference of fraudulent intent. First, the complaint fails to allege with particularity the nature of the HSBC Defendants' own due diligence reviews. *Id.* at ¶¶ 9, 20, 75. It only alleges that the "HSBC Defendants were aware of ... inflated appraisals based on their own due diligence." *Id.* at ¶ 75. "[A]n allegation that defendants had access to information that was inconsistent with their alleged misstatements must specifically identify the reports or statements containing this information." *Landesbank Baden–Wurttemberg v. Goldman, Sachs & Co.,* 478 F. App'x. 679, 682 (2d Cir.2012) (citations and internal quotation marks omitted) (affirming the district court's dismissal of an action where the defendants allegedly had access to due diligence reports that showed the low quality of mortgages, but the complaint did not specifically identify any of the reports). *See also Union Cent. Life Ins. Co. v. Credit Suisse Sec. (USA), LLC,* No. 11 Civ. 2327, 2013 WL 1342529, at *7 (S.D.N.Y. Mar. 29, 2013) (citation omitted) ("Plaintiffs' general allegations that Defendants did their own diligence and therefore knew that the underlying loans did not comply with underwriting guidelines are insufficient because they lack the necessary specificity."). Plaintiffs have not specifically identified the reports or statements regarding the alleged inflated appraisals or nonconforming loans here. Thus, the allegation does not help Plaintiffs

meet their burden of pleading intent to defraud with particularity.

**\*20** Other allegations are equally as unhelpful to Plaintiffs in sustaining their burden because they do not sufficiently state with particularity the circumstances surrounding the alleged fraud. The assertion that the FCIC report indicated that issuers used the existence of underwriting exceptions to negotiate discounts for themselves when purchasing bulk loans and "Plaintiffs have no reason to believe that the HSBC Defendants deviated from this industry-wide practice" (Compl.¶ 104) is precisely the type of general and conclusory allegation which cannot survive Rule 9(b)'s requirements.

Plaintiffs allege that the HSBC Defendants "had full and unfettered access to documents and information about the poor credit quality and systematic underwriting deviation" of Decision One, the originator of loans for two of the Securitizations at issue. *Id.* at ¶ 108. Plaintiffs have failed to allege that the HSBC Defendants actually accessed Decision One's books and thereby obtained the kind of knowledge that would give rise to scienter. Plaintiffs argue that they pleaded that "HSBC had access to and in fact did review the loan files for, at least, loans originated by its affiliate Decision One" because "Defendants conducted due diligence using loan files and other information gathered when they purchased the loans from originators. Compl. ¶¶ 20, 203." Pl. Mem. 19. However, vague allegations of the HSBC Defendants' due diligence reviews or reports, even with respect to Decision One loans, fail for the same reason they failed above. Plaintiffs have not specifically identified the reports or statements that reveal the HSBC Defendants knew Decision One had abandoned its underwriting guidelines. *See Landesbank Baden–Wurttemberg,* 478 F. App'x. at 682.

Although the Clayton Report and Plaintiffs' investigations into LTV ratios and owner-occupancy rates do provide some circumstantial evidence of scienter, they do not individually or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 6667601 (S.D.N.Y.)
**(Cite as: 2013 WL 6667601 (S.D.N.Y.))**

collectively provide the strong inference of fraudulent intent necessary to satisfy the requirements of Rule 9(b). In *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.,* 902 F.Supp.2d 476, 493 (S.D.N.Y.2012), the plaintiff offered an almost identical investigation into LTV ratios and owner-occupancy rates to establish scienter. The court stated that although "the magnitude of inaccuracy can sometimes provide circumstantial evidence that a fraud defendant made her false statement knowingly or recklessly ... such evidence must be supported by additional circumstantial evidence in order for the plaintiff to carry her pleading burden, particularly where the originator of the false information is a third-party." *Id.* (citations omitted). In *JPMorgan,* the plaintiff did not "put forth any such supporting evidence with respect to its owner occupancy and LTV allegations ... other than the fact that the bank represented to investors that it reviewed a sample of securitized loans to verify, *inter alia,* 'appraisal valuation.'" *Id.* However, this scintilla of supporting evidence was not enough because the complaint provided "no basis to determine how frequently [the defendant] made efforts to do so or what percentage of loans reviewed pursuant to [the defendant's] general due-diligence efforts were flagged on the basis of a questionable appraisal." *Id. See also Fed. Hous. Fin. Agency v. Merrill Lynch & Co.,* 903 F.Supp.2d 274, 278 (S.D.N.Y.2012).

**\*21** Plaintiffs argue that "[a]lthough the court in *JP Morgan* [sic] dismissed LTV and owner-occupancy claims on the basis of a failure to allege scienter, the case is distinguishable from this case because Plaintiffs here specifically allege that the due diligence performed by Clayton included an analysis into LTV and owner-occupancy rates. Compl. ¶¶ 99, 105." Pl. Mem. 19. Plaintiffs' argument is unavailing because like the complaint in *JPMorgan,* the complaint here provides no basis to determine how frequently Clayton made efforts to analyze LTV and owner-occupancy rates or what percentage of loans reviewed pursuant to its due diligence efforts were flagged based on

questionable LTV or owner-occupancy data. Indeed, the Clayton Report does not even define an "event-level '3.'" *See* Moon Decl. Ex. AA, at 6. The report also fails to state the criteria Clayton considered in its review. *Id.* An "event-level '3'" might mean that a loan did not comply with underwriting guidelines, or that it violated state and federal lending regulations, or perhaps failed to satisfy the clients' risk tolerances, but the Court has no way of knowing. *See id.* Indeed, the complaint does not allege the basis for asserting that Clayton reviewed LTV and owner-occupancy. *See* Compl. ¶ 99 (stating only that "[Clayton due diligence] scrutinized many aspects of the originator's guidelines, including LTV ratios and owner-occupancy rates"); *Id.* at ¶ 105 (stating only that the "[HSBC Defendants'] 'waiving in' loans that failed to meet such criteria as the stated LTV, CLTV and owner-occupancy standards for underwriting has obvious adverse effects on investors.").

Lastly, the Clayton Report does not provide a strong inference of fraudulent intent sufficient to survive Rule 9(b). In *Union Cent.,* 2013 WL 1342529, at \*7, the court rejected the argument that the Clayton Report is sufficient to allege scienter. The court held that "[a]lthough the Clayton Trending Report indicates that Defendants were made aware that a percentage of the loans that they were securitizing were not compliant with underwriting standards, the allegations do not compel an inference that Defendants knew, as Plaintiffs allege, that the originators had 'completely abandoned their underwriting standards.'" *Id.* (citations omitted). Indeed, here, as in *Union Cent.,* "Plaintiffs do not allege that Clayton necessarily did diligence on any of the loans underlying the securitizations at issue in this case or provided information with respect to those loans to Defendants." *Id.* Plaintiffs acknowledge that the "Clayton report is not sufficient 'on its own' to establish scienter." Pl. Mem. 21. Yet, Plaintiffs have failed to offer any allegations which buttress the Clayton Report. Indeed, with respect to alleging that the HSBC Defendants securitized

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 6667601 (S.D.N.Y.)
**(Cite as: 2013 WL 6667601 (S.D.N.Y.))**

loans knowing the originators had abandoned their underwriting guidelines, the Clayton Report stands alone in the pleadings.

**\*22** Plaintiffs argue that "numerous courts have upheld use of the Clayton Reports to establish scienter," (Pl.Mem.21) citing *Allstate Ins. Co. v. Countrywide Financial Corp.,* 824 F.Supp.2d 1164 (C.D.Cal.2011). Plaintiffs also argue that the complaint should not be dismissed because it contains the same allegations as in *JPMorgan,* where the fraudulent underwriting guidelines claim survived. But, the complaints in *Allstate* and *JPMorgan* contained detailed factual allegations that gave rise to a strong inference of fraudulent intent. In *Allstate* the complaint included:

> statistical analyses purporting to demonstrate that that [sic] appraisals and owner-occupancy statistics were overstated ... third party reports purporting to show the same ... internal documents purporting to show that Countrywide was aware that it had sacrificed underwriting standards for market share ... statements by Countrywide insiders and customers purporting to show that it was company policy to circumvent the underwriting guidelines ... and statements by appraisal companies and customers who claim Countrywide acted to inflate appraisal values.

*Id.* at 1187 (citations omitted). The complaint in *JPMorgan* alleged "a variety of allegations" that when "taken together" adequately pleaded scienter. *JPMorgan,* 902 F.Supp.2d. at 491, 493. These allegations included statements from JPMorgan witnesses, as well as quotes from internal documents demonstrating that JPMorgan knew it was securitizing low quality loans from its own subprime lending arm, CHF. *Id.* at 492–93 ("Speaking specifically about the potential to securitize and sell off questionable loans, [the CHF executive] said, 'The bigwigs of the corporation knew [about declining lending standards], but they figured we're going to make billions out of it, so who cares? The government is going to bail us out. And the problem loans will be out of here, maybe

even overseas.' "). However, unlike the complaints in *Allstate* and *JPMorgan,* the complaint here does not refer to internal documents and statements from insiders or third-party companies (other than the one report from Clayton) which indicate that Defendants were aware of the abandoned underwriting guidelines. Plaintiffs' argument that "plaintiffs [sic] in *JP Morgan* [sic] were quasi-government entities with access to critical discovery unavailable to Plaintiffs to be used in their pleadings" (Pl.Mem.18) is unavailing. Even if a relaxed pleading standard did apply (it does not), FN11 "plaintiffs proceeding under the relaxed standard [must still] allege facts that would support a 'strong inference of fraud' "—something Plaintiffs fail to do here. *See U.S. ex rel. Monda v. Sikorsky Aircraft Corp.,* 207 F. App'x 28, 29 (2d Cir.2006) (quoting *Wexner,* 902 F.2d at 172).

> FN11. The relaxed pleading standard only applies when "facts are peculiarly within the opposing party's knowledge." *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990) (citations omitted). That is not the case here, as the loans were purchased from third-party originators and third-party due diligence vendors also had access to the loan files.

Finally, Plaintiffs argue that "[c]ourts also have repeatedly held that [a] plaintiff need not allege that any particular loan or loans were issued in deviation from the underwriting standards, so long as the complaint alleges widespread abandonment of underwriting guidelines, which is what Plaintiffs allege here." Pl. Mem. 21 (citations and internal quotation marks omitted). However, the cases on which Plaintiffs rely do not specifically discuss Rule 9(b) or scienter. Indeed, *Employees' Ret. Sys. of the Virgin Islands v. J.P. Morgan Chase & Co.,* 804 F.Supp.2d 141, 152 (S.D.N.Y.2011) involves a claim under Section 11 of the Securities Act which "is not subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b).... Rather, it is subject to the short and plain statement

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 6667601 (S.D.N.Y.)
**(Cite as: 2013 WL 6667601 (S.D.N.Y.))**

requirements of Rule 8(a) ... and thus places a relatively minimal burden on a plaintiff." (citations and internal quotation marks omitted). The portion of *N.J. Carpenters Health Fund v. Residential Capital, LLC,* No. 08 Civ. 8781, 2010 WL 1257528, at *6 (S.D.N.Y. Mar. 31, 2010), relied upon by Plaintiffs involves an analysis of whether the plaintiffs had satisfied the first prong of a fraud claim—a materially false statement—not the element of scienter. And, *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* 87 A.D.3d at 295, also inapposite, offers no discussion of scienter—and even if it did, the case would be distinguishable because it involved Countrywide Home Loans, Inc.—an originator defendant.

**\*23** Accordingly, Plaintiffs' claims of fraud and aiding and abetting fraud are dismissed.

### CONCLUSION

Defendants' motion is GRANTED in its entirety and the complaint is DISMISSED. The Clerk of the Court is directed to close the case.

SO ORDERED.

S.D.N.Y.,2013.
Deutsche   Zentral-Genossenschaftsbank   AG   v.
HSBC North America Holdings, Inc.
Slip Copy, 2013 WL 6667601 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

In re COUNTRYWIDE FINANCIAL
CORPORATION MORTGAGE-
BACKED SECURITIES LITIGATION

AMERICAN INTERNATIONAL
GROUP, INC., *et al.*,

Plaintiff,

v.

COUNTRYWIDE FINANCIAL CORP.,
*et al.*,

Defendant.

Case No. 2:11-ML-02265-MRP
(MANx)

Case No. 2:11-CV-10549 MRP
(MANx)*

**Order Regarding Plaintiffs' Motion
for Reconsideration of the Court's
September 30, 2013 Order
Dismissing Certain Claims**

# I.   INTRODUCTION

Plaintiff American International Group, Inc. ("AIG") moves for reconsideration of this Court's order dated September 30, 2013 (the "September 30 Order") dismissing fraudulent inducement claims against former defendants Merrill Lync & Co. and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), and former defendant Banc of America Securities LLC ("BAS") (collectively, the "Underwriter Defendants").   In its Re-filed Second Amended Complaint ("SAC"), AIG alleged that the Underwriter Defendants underwrote and sold six Countrywide residential mortgage-backed securities ("RMBS")[1] to AIG while knowing that portions of the loans supporting the RMBS failed to meet underwriting standards.  AIG's fraud claims against the Underwriter Defendants principally relied on three due diligence reports prepared by third-party vendor Clayton Services, Inc. ("Clayton") regarding non-conforming loans that were originated by Countrywide or included in Countrywide securitizations.  The September 30 Order held that these reports, along with the other allegations in the SAC, collectively failed to support a reasonable inference of scienter on the part of the Underwriter Defendants because, *inter alia*, AIG nowhere alleges that the Underwriter Defendants received or knew of the information provided in the reports or what was conveyed in those reports with respect to non-conforming loans from Countrywide.  *AIG v. Bank of America Corp.*, No. 2:11-CV-10549, 2013 WL 56142924, at *6–8 (C.D. Cal. Sept. 30, 2013).  AIG urges the Court to reconsider the September 30 Order after purportedly discovering new evidence in the form of due diligence reports provided by Clayton to BAS showing non-conforming loans in connection with a securitization at issue in this case.  For the reasons set forth below, Plaintiff's motion is **DENIED**.

---

[1] Those RMBS are as follows: CWL 2005-9, CWL 2006-S&, CWL 2007-11, CWALT 2006-26CB, CWHL 2005-7, CWHL 2006-8, and CWL 2005-13.

## II. LEGAL STANDARD

Motions for reconsideration are governed by the Local Rules of this district. Local Rule 7-18 provides that reconsideration is permissible only on the following grounds: "(a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision." L.R. 7-18. The Local Rule further states that "[n]o motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion." *Id*.

## III.   DISCUSSION

AIG's moving papers in large part attempt to re-explain how the allegations in the SAC adequately pled scienter and identify error in the September 30 Order. (Dkt. No. 396 at 2–11). A motion for reconsideration, however, "may not be used as a device to raise new legal arguments which could have been raised previously, nor may it be based on repetition of arguments already considered by the Court." *Davidson v. City of Culver City*, No. 04-CV-2220, 2004 WL 5361891, at *6 (C.D. Cal. Sept. 20, 2004). The Court's September 30 Order considered and rejected the arguments AIG now rehashes. Indeed, after the motion for reconsideration was fully submitted, one district court recently rendered a decision involving a Clayton due diligence report which provided an analysis of loan files similar to the Clayton reports alleged in the SAC. *See Deutsche Zentral-Genossenschaftsbank AG v. HSBC North America Holdings, Inc.*, No. 12-CV-4025, 2013 WL 6667601, at *19 (S.D.N.Y. Dec. 17, 2013) ("*Deutsche Zentral*"). In *Deutsche Zentral*, 26.8% of the loans sampled by Clayton failed to satisfy underwriting guidelines; nevertheless, HSBC knowingly "waived in" 62.3% of these non-conforming loans into

securitizations sold to investors.  *Id.*  The court found that this allegation failed to establish scienter on the part of HSBC even under a relaxed Rule 9(b) pleading standard because "Plaintiffs do not allege that Clayton necessarily did diligence on any of the loans underlying the securitizations at issue in this case or provided information with respect to those loans to Defendants."  *Id.* at *21 (quoting *Union Cent. Life Ins. Co. v. Credit Suisse Sec. (USA), LLC*, No. 11-CV-2327, 2013 WL 1342529, at *7 (S.D.N.Y. Mar. 29, 2013).

*Deutsche Zentral* follows a long line of cases reaching a similar conclusion. *See, e.g.*, *In re Lehman Bros. Sec. & ERISA Litig.*, 10-CV-6637, 2013 WL 3989066, at *5 (S.D.N.Y. July 31, 2013) ("The amended complaint makes the vague assertion that Clayton provided due diligence reports to RBS 'during the housing boom,' but does not allege with any specificity when Clayton provided due diligence reports to RBS or whether Clayton's due diligence implicated in any way the mortgages underlying the security at issue."); *Union Cent.*, 2013 WL 1342529, at *7 (S.D.N.Y. Mar. 29, 2013) ("Although the Clayton Trending Report indicates that Defendants were made aware that a percentage of the loans that they were securitizing were not compliant with underwriting standards, the allegations do not compel an inference that Defendants knew, as Plaintiffs allege, that the originators had 'completely abandoned their underwriting standards.'") (quotation omitted); *Woori Bank v. RBS Sec., Inc.*, 910 F. Supp. 2d 697, 703 (S.D.N.Y. 2012) ("There is nothing to tie the Clayton report and other alleged facts about the defendants' knowledge of inadequate mortgage underwriting to the specific offerings in this case."); *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 622 (S.D.N.Y. 2011) aff'd, 478 F. App'x 679 (2d Cir. 2012) ("Thus, the relevant inquiry is whether Landesbank has specifically identified any contemporaneous report or statement showing that Goldman knew in March 2006 about the toxicity of the mortgages underlying Davis Square.  But Landesbank only references the Clayton Report without alleging who drafted it,

who prepared it, or who, if anyone, at Goldman reviewed it.") (citation omitted). Thus, to the extent AIG's motion relies on the allegations already presented to the Court in the SAC, the September 30 Order does not warrant reconsideration.

Another component of AIG's motion for reconsideration, however, presents something of a novel issue not previously considered by this Court. AIG adduces new evidence—which purportedly was "only recently made available to AIG in discovery"—regarding one of the Countrywide securitizations at issue in this case, CWALT 2006-26CB. (Dkt. No. 359 at 11.) AIG's motion for reconsideration chronicles various e-mail exchanges and Clayton compliance reports involving employees from Countrywide, BAS, and Clayton as they engaged in the due diligence process prior to marketing CWALT 2006-26CB. (*Id.* at 13–18.) As part of this due diligence process, Clayton provided a report to BAS that reviewed 93 sampled loans from the loan group supporting CWALT 2006-26CB. (*Id.* at 17.) According to AIG, 34 of the 93 loans (or 36%) were identified by Clayton as defective. (*Id.*) AIG alleges that 20 of the 34 defective loans (or 59%) were "overturned" and included in CWALT 2006-26CB. (*Id.*) AIG contends that "these newly-discovered Clayton reports confirm AIG's allegations that Countrywide abandoned its guidelines when originating loans and that BoA, as underwriter, was well aware of, or at a minimum was reckless in, underwriting RMBS collateralized by defective loans." (*Id.*)

Defendants argue, as a threshold matter, that the Court should not even consider this new evidence, as AIG has not explained how the Clayton report constitutes new or different material facts that, as the Local Rules require, "in the existence of reasonable diligence could not have been known to the party moving for reconsideration at the time of [the original] decision." L.R. 7-18(a). The Court finds that this newly discovered evidence, even when considered collectively with the other allegations in the SAC, fails to adequately plead scienter on the part of the Underwriter Defendants. As such, the Court assumes without deciding that this

new evidence meets the standard for motions for reconsideration under Local Rule 7-18(a).

Turning to the adequacy of AIG's newly discovered evidence, the Court notes that misrepresentations must be pleaded with particularity, while knowledge may be averred generally. Fed. R. Civ. Proc. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). However, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A factual allegation "merely consistent with" liability, "stops short of the line between possibility and plausibility of entitlement to relief." *Id.* Rather, the allegations must have "enough heft to show that the pleader is entitled to relief." *Twombly*, 550 U.S. at 580.

Here, the new evidence proffered by AIG—when considered collectively with the other allegations in the SAC—fails to plausibly allege scienter on the part of BAS. The compliance reports, contemporaneous e-mail exchanges, and related documentation show that most of the defects stemmed from missing information or illegible documentation—*e.g.*, credit reports, credit scores, and appraisal values— necessary for Clayton to evaluate the selected loan files. The e-mail exchanges in particular, trumpeted by AIG as evidence of scienter, suggest that Countrywide endeavored to provide, and in fact did provide, the missing documentation needed to cure most of the deficient loan files. In one e-mail, for example, a representative of Countrywide expressed a concern to BAS that Clayton commence the due diligence process promptly, so that Countrywide would have adequate time to address any defects in the loan files prior to marketing. (*See* Asperger Decl., Ex. D at 31.) During the due diligence process, Clayton sent an e-mail to representatives of BAS and Countrywide stating that it had received information to resolve "quite

a few" of the defective loans, while the remaining defective loans were "mainly due to bad copies and illegible doc[uments]." (*Id.*, Ex. H at 112.) According to a final report provided by Clayton at the conclusion of the due diligence process, only 14 loans in a sample of 93 total loans had not been cured. (*See id.*, Ex. A at 4–11.) Many of the 14 loans also appear to have involved missing documentation.

Thus, the only plausible inference drawn from AIG's newly discovered evidence is that most of the loans originally identified as defective were overturned because Countrywide provided the missing information Clayton required. Far from putting BAS on notice of fraudulent underwriting practices at Countrywide, the evidence suggests—at best—that Countrywide lacked adequate protocols to ensure that Clayton receive supporting documentation necessary to evaluate all of its loan files.[2] Indeed, even if AIG adduced similar evidence for each of the other securitizations underwritten by BAS and Merrill Lynch, which AIG promises would emerge after additional discovery, AIG would still not prevail. At bottom, the due diligence process described by the new evidence—*i.e.*, the retention of a third-party due diligence firm, the iterative endeavor to provide supporting documentation to cure defects, and the copious communication which occurred

---

[2] AIG contends that alternative explanations offered by Defendants concerning overturned loans based on information contained in the newly discovered documents amounts to a factual dispute best suited for summary judgment. (Dkt. No. 405 at 37.) Under Ninth Circuit law, however, the Court may properly consider such evidence at the motion to dismiss stage. *See, e.g.*, *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996) ("The district court considered the full text of the Prospectus, including portions which were not mentioned in the complaints. We note that such consideration is appropriate in the context of a motion to dismiss, and does not convert the motion into one for summary judgment. Documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss.") (quotation marks and citation omitted). Moreover, the Court must read the complaint as a whole, together with matters appropriate for judicial notice, rather than isolating allegations and taking them out of context. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

1   amongst client, seller and due diligence vendor prior to marketing—contravenes
2   what one expects when fraud is afoot.  Accordingly, the Court finds that the
3   evidence, even when considered collectively with the other allegations in the SAC,
4   fails to adequately plead scienter.
5       AIG last contends that the Court erred by failing to offer leave to amend the
6   complaint.  (Dkt. No. 359 at 18–20.)  "The court considers five factors in assessing
7   the propriety of leave to amend—bad faith, undue delay, prejudice to the opposing
8   party, futility of amendment, and whether the plaintiff has previously amended the
9   complaint."  *United States v. Corinthian Colls.*, 655 F.3d 984, 995 (9th Cir. 2011).
10  The last two factors are most applicable in this instance.  AIG has effectively been
11  afforded three opportunities to allege scienter against the Underwriter Defendants.
12  On May 6, 2013, the Court dismissed AIG's first attempt to plead scienter but
13  granted leave to amend, noting that "AIG must plead that Merrill Lynch and BoA
14  Securities knew of malfeasance at Countrywide."  *AIG v. Bank of America Corp.*,
15  943 F. Supp. 2d 1035, 1058 (C.D. Cal. 2013).  AIG attempted to address this
16  foundational defect by providing supplemental allegations in the SAC.  In
17  opposition to Defendants' motion to dismiss the SAC, AIG argued that the "strong
18  circumstantial evidence" it presented in the SAC was sufficient to plead scienter,
19  and that because the specific Clayton reports for the RMBS at issue were not
20  available without discovery "[n]othing more could reasonably be alleged."  (Dkt.
21  No. 328 at 8.)  But because AIG still failed to establish scienter and AIG, by its
22  own admission, presumably did all it could to remedy the pleading deficiencies in
23  the SAC, the Court dismissed with prejudice on the ground that further amendment
24  would be futile.  *AIG*, 2013 WL 56142924, at *17–18 (C.D. Cal. Sept. 30, 2013).
25  AIG's motion for reconsideration has ultimately amounted to yet another
26  opportunity to plead scienter against the Underwriter Defendants.  The SAC,
27  however, still fails to do so under Rule 9(b) and *Iqbal*.  Accordingly, AIG's request
28  to modify the September 30 Order to dismissal without prejudice is **DENIED**.

1    *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1072 (9th Cir.

2    2008) ("[T]he district court's discretion to deny leave to amend is particularly

3    broad where plaintiff has previously amended the complaint.") (internal quotation

4    marks and citation omitted).

5                                    **IV.    CONCLUSION**

6              For the foregoing reasons, AIG's motion for reconsideration of the

7    September 30 Order is **DENIED**.  AIG's alternative request to modify the

8    September 30 Order to dismissal without prejudice is also **DENIED**.

9

10   IT IS SO ORDERED.

11

12   DATED:  January 7, 2014

13                                                    _____

                                                      Hon. Mariana R. Pfaelzer

14                                                    United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9