UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LANDESBANK BADEN-WÜRTTEMBERG, GEORGES QUAY FUNDING I LIMITED, SPENCERVIEW ASSET MANAGEMENT LIMITED and CALEDONIAN TRUST (CAYMAN) LIMITED, ACTING IN ITS CAPACITY AS TRUSTEE OF THE LEVERAGED ACCRUAL ASSET MANAGEMENT SUB-TRUST, A SUB-TRUST OF THE PANACEA TRUST, THE LEVERAGED ACCRUAL ASSET MANAGEMENT II SUB-TRUST, A SUB-TRUST OF THE PANACEA TRUST, AND THE LEVERAGED ACCRUAL ASSET MANAGEMENT XI SUB-TRUST, A SUB-TRUST OF THE PIVOT MASTER TRUST, | **MEMORANDUM OPINION & ORDER** 12 Civ. 5476 (PGG) |
| Plaintiffs, | |
| – against – | |
| RBS HOLDINGS USA INC., RBS SECURITIES INC. (f/k/a GREENWICH CAPITAL MARKETS, INC.), RBS ACCEPTANCE INC. (f/k/a GREENWICH CAPITAL ACCEPTANCE, INC.) and RBS FINANCIAL PRODUCTS INC. (f/k/a GREENWICH CAPITAL FINANCIAL PRODUCTS, INC.), | |
| Defendants. | |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: April 9, 2014

PAUL G. GARDEPHE, U.S.D.J.:

This action arises from Plaintiffs' investment in residential mortgage-backed

securities that were issued or underwritten by RBS Holdings USA Inc., RBS Securities Inc., RBS

Acceptance, Inc., and RBS Financial Products Inc. (collectively, the "Defendants" or "RBS").

Defendants have moved to dismiss the consolidated complaint (the "Complaint") pursuant to

Fed. R. Civ. P. 12(b)(1) and (6), and to strike certain paragraphs of the Complaint pursuant to

Fed. R. Civ. P. 12(f).  (Dkt. No. 11)  On March 31, 2014, this Court issued and order granting Defendants' motion in part, and denying the motion in part.  The purpose of this opinion is to explain the Court's reasoning.

**BACKGROUND**[1]

I.     **MORTGAGE SECURITIZATION**

Residential mortgage-backed securities ("RMBS") are financial products collateralized by residential mortgages.  Securitization is the process through which thousands of individual mortgages are pooled together into discrete trusts, which then issue securities to investors in the form of certificates.  (Cmplt. (Dkt. No. 6) ¶ 34)  A trustee is appointed to oversee the management of each trust, which involves, among other things, distributing revenue payments to the holders of trust certificates.  (Id.)  The source of this revenue is the monthly payments made by borrowers whose mortgages are held by the trust.  (Id.)

The RMBS process begins with lending institutions, or "originators," that make home loans to consumers that are secured by mortgages.  (Id. ¶ 35)  In an effort to ensure that borrowers will be able to repay their loans, originators employ certain underwriting guidelines, or metrics, that they use to evaluate borrowers' creditworthiness.  (Id. ¶ 47)  A "sponsor" or "seller" of RMBS – usually an affiliate of an investment bank – purchases the mortgages in bulk from one or more originators.  (Id. ¶ 35)  Frequently, the sponsor provides "warehouse" lines of credit to originators to facilitate lending.  (Id.)  The sponsor or seller then pools thousands of the mortgage loans together and transfers them to a "depositor" – usually another affiliate of the

---

[1]  The Court's factual statement is drawn from the Complaint.  "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint."  Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. Of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)).

same investment bank.  (<u>Id.</u> ¶ 36)  The sponsor and depositor are both considered to be an "issuer" of the RMBS.  (<u>Id.</u>)

The issuer typically re-underwrites the loans made by the originators; in other words, it conducts an independent assessment of the individual borrower's ability to meet the mortgage obligations.  This assessment involves reviewing the loan files provided by the originators, which contain the information gathered by originators in the lending process.  (<u>Id.</u> ¶¶ 42-43)  Issuers usually delegate this work to third-party due diligence vendors, such as Clayton Holdings, LLC ("Clayton"), which verify key information contained in the loan files, including the borrower's income, assets, credit history, and employment.  (<u>Id.</u> ¶¶ 40, 43)  After review, the due diligence vendor provides the issuer with a report of its findings.  (<u>Id.</u> ¶ 44)  This report assesses the quality of the loans with reference to the originator's stated underwriting guidelines, and identifies which loans comply with the guidelines and which do not.  (<u>Id.</u>)  The issuer then uses this report to determine which loans to pool together in a securitization.  (<u>Id.</u> ¶¶ 44-45)

Once the desired pool of loans is assembled, the depositor transfers the loans into an "issuing trust."  (<u>Id.</u> ¶ 37)  It then securitizes the loan pool so that the rights to the cash flow from the loans can be sold to investors.  The loan pool is securitized in "tranches," each of which has a different risk profile.  (<u>Id.</u>)  The most senior tranches are the least risky – they enjoy first priority in claiming payments from mortgagors.  (<u>Id.</u>)  Conversely, the junior tranches are the last to receive their share of borrowers' repayments, and thus carry more risk and a higher return; they are also the first to be impacted by losses in the loan pool.  (<u>Id.</u>)  Once this process is completed, the depositor passes the certificates to underwriters, who offer them for sale to investors.  (<u>Id.</u> ¶ 38)  Investors interested in purchasing the certificates are provided "Offering Materials," prepared by the issuer, which make representations regarding important

characteristics of the loan pool.  (Id. ¶ 45)  Offering Materials include the loan-to-value (LTV)

and combined loan-to-value (CLTV) ratios of the mortgages, the originators' adherence to

underwriting standards, and the owner-occupancy status of the mortgaged properties.  (Id.)  The

Offering Materials also certify that the mortgages and all necessary underlying documentation

will be transferred to the trust.  (Id.)

## II.     THE PARTIES

Plaintiff Landesbank Baden-Württemberg ("LBBW") is a commercial bank

incorporated in Germany.  (Id. ¶ 19)  LBBW's claims relate to certificates it acquired in

connection with its 2008 acquisition of another German bank, Sachsen LB, and that bank's

subsidiary, Sachsen LB Europe Plc.  (Id. ¶ 20)  Plaintiff Georges Quay Funding I Limited

("Georges Quay") is a special purpose vehicle incorporated in Ireland and formerly managed by

Sachsen LB Europe.  It purchased and holds RMBS certificates issued by one or more of the

Defendants.  (Id. ¶ 24)  Plaintiff Spencerview Asset Management Limited ("Spencerview") is a

special purpose vehicle set up by LBBW and incorporated in Ireland.  LBBW transferred to

Spencerview some of the certificates that it acquired from Sachsen LB Europe.  (Id. ¶ 22)

Plaintiff Caledonian Trust (Cayman) Limited ("Caledonian") serves as Trustee for the following

trusts:  the Leveraged Accrual Asset Management Sub-Trust ("LAAM I"), a sub-trust of the

Panacea Trust; the Leveraged Accrual Asset Management XI Sub-Trust ("LAAM II"), a sub-

trust of the Panacea Trust; and the Leveraged Accrual Asset Management XI Sub-Trust

("LAAM XI"), a sub-trust of the Pivot Master Trust.  (Id. ¶ 25)  LBBW became sole investor in

LAAM I, LAAM II, and LAAM XI upon its acquisition of Sachsen LB.  (Id.)

Defendant RBS Holdings USA Inc. ("RBS Holdings"), RBS Securities Inc.

("RBS Securities"), RBS Acceptance Inc. ("RBS Acceptance"), and RBS Financial Products

4

("RBS Financial Products"), are Delaware corporations headquartered in Stamford, Connecticut. (Id. ¶¶ 27-30)  RBS Holdings is a wholly owned subsidiary of The Royal Bank of Scotland Group PLC, and was known as Greenwich Capital Holdings, Inc. until April 2009.  (Id. ¶ 27) RBS Holdings is the parent company of Defendants RBS Securities Inc., RBS Acceptance Inc., and RBS Financial Products Inc.  (Id.)  RBS Securities is a registered broker-dealer and was an active underwriter of RMBS.  Prior to April 2009, RBS Securities was known as Greenwich Capital Markets, Inc.  (Id. ¶ 28)  RBS Acceptance served as a depositor for RMBS securitizations and was known as Greenwich Capital Acceptance, Inc. until August 2007.  (Id. ¶ 29)  RBS Financial Products was the sponsor for certain securitizations at issue and was known as Greenwich Capital Financial Products, Inc. prior to April 2009.  (Id. ¶ 30)

## III.    THE COMPLAINT

Plaintiffs allege various improprieties by Defendants in connection with the creation, offering, and sale of certain RMBS.  Plaintiffs assert against all Defendants causes of action for common law fraud, fraudulent concealment, and, in the alternative, negligent misrepresentation.  (Id. ¶¶ 325-44, 351-358)  Against Defendant RBS Securities only, Plaintiffs assert claims of aiding and abetting fraud or, alternatively, a claim of rescission based on mutual mistake.  (Id. ¶ 345-350, 359-365)

In 2006 and 2007, Plaintiffs purchased more than $243 million worth of RMBS certificates from Defendants (the "Certificates").  (Id. ¶ 1)  These Certificates were issued, marketed, and sold by Defendants in three separate RMBS securitizations:  MHL 2006-1, HVMLT 2006-12, and HVMLT 2007-5 (collectively, the "Securitizations").  (Id. at 11, Table ("tbl.") 1)  Defendants acquired the loans underlying these Certificates from third-party mortgage originators (and non-parties to this action) Countrywide Homes Loans, Inc.

("Countrywide"), American Home Mortgage Corp. ("American Home") and MortgageIT, Inc. ("MortgageIT"). (Id. ¶32) Plaintiffs allege numerous knowing misrepresentations of material fact made by Defendants through the Offering Materials for the Securitizations, which included registration statements, prospectuses, prospectus supplements, and other filings. (Id. ¶ 4) Each Securitization had its own set of Offering Materials.

        The misrepresentations alleged by Plaintiffs relate to different stages of the securitization process. At the origination stage, Plaintiffs allege that Defendants failed to reveal in the Offering Materials that originators systematically abandoned their underwriting standards, thereby reducing the quality of loans in the securitization pool by making it less likely that borrowers would be able to repay. (Id. ¶¶ 75-81) After origination, Plaintiffs allege that Defendants manipulated and failed to disclose the true results of their due diligence vendors' review of the loan pools. These actions led to poor-quality loans being included in the Securitizations. (Id. ¶¶ 82-84) Plaintiffs further allege that Defendants understated the LTV and CLTV ratios of the Securitizations' loan pools by overstating the appraised values of the underlying properties. (Id. ¶¶ 85-113) These figures are material to investors' assessment of a given loan pool, as they reflect the amount of equity that borrowers have in their homes, which, in turn, affects the likelihood of repayment. (Id. ¶ 86) The metrics also inform investors of the trustee's ability to recover value from the property in the event of foreclosure. (Id. ¶ 88) The Complaint also alleges misrepresentations about the owner-occupancy status of mortgaged properties included in the Securitizations (Id. ¶¶ 114-22), as well as failures to transfer mortgages and notes to the trusts (Id. ¶¶ 207-41).

**DISCUSSION**

## I.   DEFENDANTS' MOTION TO STRIKE

Defendants have moved to strike Paragraphs 133, 135-37, 141-42, 144-46, 150-64, 170-76, 190-95, 198, 241, 284-85, and 313 of the Complaint on the grounds that they refer to news articles and complaints in other actions. See Def. Mot. (Dkt. No. 11); Def. Br. (Dkt. No. 12) at 19 (citing RSM Prod. Corp. v. Fridman, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009), aff'd, 387 F. App'x 72 (2d Cir. 2010) ("Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f)." (citing Lipsky v. Commonwealth United Corp., 551 F.2d 887, 892–94 (2d Cir. 1976))).

"To prevail on a [Rule 12(f)] motion to strike, a party must demonstrate that (1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." In re Fannie Mae 2008 Sec. Litig., No. 08 Civ. 7831 (PAC), 2012 WL 3758537, at *4 (S.D.N.Y. Aug. 30, 2012) (alteration in original) (internal quotation marks and citations omitted). Defendants have not met this standard.

RSM Prod Corp., 643 F. Supp. 2d 382, cited by Defendants, relies on Lipsky, 551 F.2d 887. Although "some courts in this district have stretched the holding in Lipsky to mean that any portion of a pleading that relies on unadjudicated allegations in another complaint is immaterial under Rule 12(f)[,] [n]either Circuit precedent nor logic supports such an absolute rule." In re Bear Stearns Mortgage Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012) (internal citation omitted).

7

Here, the news reports and complaints cited in the disputed paragraphs are neither extraneous nor immaterial to the Complaint's allegations.  For example, Plaintiffs allege that "Defendants' systematic misrepresentation of the quality of the Certificates they created and sold" is evidenced by an FHAA forensic review of a May 2007 RBS offering.  In referring to this study, Plaintiffs cite to the complaint filed in Federal Housing Fin. Agency v. The Royal Bank of Scotland Group plc, et al., No. 11-CV-01383 AWT (D. Conn.) (ECF No. 40, Feb. 1, 2012). (Cmplt. (Dkt. No. 6) ¶ 170)  "It makes little sense to say," as Defendants urge, "that information from such a study – which [Plaintiffs' Complaint] could unquestionably rely on if it were mentioned in a news clipping or public testimony – is immaterial simply because it is conveyed in an unadjudicated complaint." Bear Stearns, 851 F. Supp. 2d at 768 n.24.  Accordingly, Defendants' motion to strike will be denied.

## II.   LEGAL STANDARD GOVERNING MOTION TO DISMISS

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. Of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair

notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).

Fraud claims are subject to Fed. R. Civ. P. 9(b), which states that "a party must state with particularity the circumstances constituting fraud or mistake." To satisfy Rule 9(b), "the complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d. Cir. 2006). To adequately plead fraud, the complaint must also plead facts that give rise to a strong inference of scienter. S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp., 84 F.3d 629, 634 (2d Cir. 1996).

### III.   LBBW AND SPENCERVIEW'S STANDING

Defendants move to dismiss the claims of LBBW and Spencerview for lack of standing pursuant to Fed. R. Civ. P. 12(b)(1). "Although standing is a fundamental jurisdictional requirement, it is still subject to the same degree of proof that governs other contested factual issues." Baur v. Veneman, 352 F.3d 625, 631 (2d Cir. 2003) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)). Accordingly, when "ruling on a motion to dismiss for want of standing," this Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Warth v. Seldin, 422 U.S. 490, 501 (1975). "[S]tanding allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury." Baur, 352 F.3d at 631.

The Complaint alleges that Sachsen LB, its wholly-owned subsidiary Sachsen LB Europe, Georges Quay, and Caledonian Trust – acting in its capacity as trustee of the Leveraged Accrual Asset Management funds – purchased the seven RMBS Certificates at

issue.[2]  (Cmplt. (Dkt No. 6) ¶¶ 23-25)

        Through a series of purchase agreements executed between mid-August 2007 and April 1, 2008, LBBW "completely assumed" "all claims and liabilities of Sachsen LB, and Sachsen LB's Certificates and [Sachsen LB Europe's] Certificates" as "universal successor by operation of German law." (Id. ¶¶ 19-21)  LBBW further alleges that it acquired Sachsen LB's rights as "sole unitholder" of the LAAM X Trust, and that it subsequently transferred the LAAM X Trust's assets to its own balance sheet upon LAAM X's "termination."  (Id. ¶ 23) Spencerview claims the right to sue on a Certificate originally purchased by Sachsen LB Europe. (Id. ¶ 22)  According to the Complaint, after LBBW acquired Sachsen LB Europe, it "transferred" a Certificate originally purchased by Sachsen LB Europe to Spencerview.  (Id.)

        Defendants assert that LBBW and Spencerview have not adequately pled standing, because the Complaint does not allege that they were assigned the right to sue on the claims they assert.  (Def. Br. (Dkt. No. 12) at 17)  Relying on New York law, Defendants contend that LBBW and Spencerview are assignees, and that "in the absence of an explicit assignment of a cause of action based on fraud, 'only the  . . . assignor may rescind or sue for

---

[2]  The table below lists the purchasing entity for each Certificate and the Plaintiff that claims to have standing to sue on each Certificate.

| Plaintiff | Offering and Class | CUSIP | Purchasing Entity |
|---|---|---|---|
| LBBW | HVMLT 2006-12 | 41162DAD1 | LAAM X |
|  | HVMLT 2007-5 | 41165AAD4 | Sachsen LB |
| Georges Quay | MHL 2006-1 | 6195RBZ8 | Georges Quay |
| Spencerview | HVMLT 2007-5 | 41165AAD4 | Sachsen LB Europe |
| Caledonian | HVMLT 2006-12 | 41162DAD1 | LAAM I |
|  | HVMLT 2006-12 | 41162DAD1 | LAAM II |
|  | HVMLT 2006-12 | 41162DAD1 | LAAM XI |

(Cmplt. (Dkt. No. 6) ¶ 25 & tbl. 1)  A CUSIP number is a 9-character alphanumeric code that identifies a security for purposes of clearing and settlement of trades.  CUSIP refers to the Committee on Uniform Security Identification Procedures.

damages for fraud and deceit.'" Id. (citing Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC, 479 F. Supp. 2d 349, 373 (S.D.N.Y. 2007) (quoting Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank, 57 F.3d 146, 151 (2d Cir. 1995))).

Plaintiffs argue, however, that LBBW and Spencerview are successors-in-interest to Sachsen LB and Sachsen LB Europe, and not their assignees. (Pltf. Br. (Dkt. No. 18) at 11) They contend that the causes of action on the underlying certificates were transferred to LBBW by operation of German law when LBBW acquired Sachsen LB and Sachsen LB Europe.

### A.       The Certificates

LBBW's claims relate to Certificates it acquired through its acquisition of Sachsen LB and Sachsen LB Europe:  the HVMLT 2007-5 Certificate originally purchased by Sachsen LB ("Sachsen LB Certificate"), and the HVMLT 2006-12 Certificate originally purchased by the Leveraged Accrual Asset Management X Sub-Trust ("LAAM X Trust"), of which Sachsen LB was the initial sole unit holder ("LAAM X Trust Certificate"). Spencerview's claim relates to a HVMLT 2007-5 Certificate that LBBW transferred to Spencerview after LBBW acquired Sachsen LB Europe (the "Sachsen LB Europe Certificate"). (Cmplt. (Dkt. No. 6) at 11, tbl. 1; ¶¶ 20-23)  Each transaction is described below.

### 1.       Sachsen LB Certificate

LBBW entered into a final, non-reversible agreement to acquire Sachsen LB and Sachsen LB Europe on December 13, 2007.  (Cmplt. ¶ 21)  On March 6, 2008, Sachsen LB and Sachsen LB Europe became wholly owned subsidiaries of LBBW.  (Id.)  The Complaint states that "[a]s of April 1, 2008, all claims and liabilities of Sachsen LB, and [the certificates that it and Sachsen LB Europe owned], were completely assumed by LBBW as universal legal successor by operation of German law." (Cmplt. (Dkt. No. 6) ¶ 21)  Plaintiffs have submitted a

11

"Notarized Confirmation of Legal Succession" stating that that "all assets and liabilities of Sachsen LB, including "all real property liens and other rights to real estate, shares, business interests and other ownership interests as well as to all titled claims" were transferred from Sachsen LB to LBBW. (Goldsmith Decl., Ex. I, ¶¶ 5-6 (Dkt. No. 19))

### 2.    LAAM X Trust Certificate

Sachsen LB was the initial sole investor in the LAAM X Trust when it purchased certain Certificates at issue. Plaintiff LBBW became sole investor in the Trust after acquiring Sachsen LB. The Complaint asserts that all of the LAAM X Trust's assets were transferred upon the Trust's termination to LBBW's balance sheet in Stuttgart, Germany. (Cmplt. ¶ 23) As evidence of the assignment from LAAM X to Landesbank, Plaintiffs have submitted a December 14, 2007 Global Master Repurchasing Agreement ("GMRA") – a standard form repurchase or "repo" contract – between Landesbank and Caledonian Trust, solely in its capacity as trustee of the LAAM X Trust. The GMRA, which is governed by English law, indicates that "all right, title and interest in and to Securities and money transferred or paid under this Agreement shall pass to the transferee upon transfer or payment. . . ." (Goldsmith Decl., Ex. J (Dkt. No. 19) ¶¶ 6(f), 17) Plaintiffs have also submitted a December 7, 2009 Agreement between, inter alia, Caledonian as sole trustee for LAAM X, LBBW as sole unitholder of LAAM X, and LBBW as GMRA counterparty to LAAM X. (Id., Ex. E) The Agreement, also governed by English law (id. ¶ 10), reflects the termination of the LAAM X Trust and the transfer of its assets to LBBW pursuant to the GMRA.

### 3.    Sachsen LB Europe Certificate

Pursuant to an August 28, 2008 Sale and Purchase Agreement, LBBW caused certain assets – including the Sachsen LB Europe Certificate – to be transferred from its wholly

owned subsidiary Sachsen LB Europe to Spencerview, a special purpose vehicle that LBBW set

up and incorporated in Ireland.  Spencerview continues to hold the Certificate.  (Cmplt. ¶ 22)

The Sale and Purchase Agreement indicates that the transfer of assets between Sachsen LB

Europe and Spencerview – including the Certificate – is to be treated as a "sale" and not as a

pledge to secure a debt or other obligation.  (Id. ¶ 5)  The Sale and Purchase Agreement does not

otherwise mention transfer or assignment of legal rights.  Irish law governs the Sale and

Purchase Agreement.  (Goldsmith Decl., Ex. C (Dkt. No. 19) ¶ 13)

      **B.**      **Analysis**

      As a preliminary matter, it is not clear what law governs the determination of

Plaintiffs' standing to sue on the various Certificates at issue.  No party has briefed the issue, or

provided any sort of choice of law analysis.

      Defendants rely on Fraternity Fund Ltd., 479 F. Supp. 2d 349 – a case brought

under New York law – for the proposition that Plaintiffs – as assignees – must allege "an explicit

assignment of a cause of action based on fraud . . . ."  (Def. Br. (Dkt. No. 12) at 17) (emphasis in

original))  Fraternity Fund involves the sale and transfer of shares, however, and not the

complete acquisition of an entity holding securities.  Accordingly, it does provide useful

guidance here.

      The Complaint alleges that LBBW acquired all of the Certificates on which the

underlying claims are based by "operation of German law" through its acquisition of Sachsen LB

and Sachsen LB Europe.  (Cmplt. ¶ 21)  According to Plaintiffs, "the German principle of

'universal legal succession'" is similar to New York law, and generally permits a corporation to

assert claims on behalf of a company that it acquires.  See Pltf. Br. (Dkt. No. 18) at 12; see also

N.Y. Bus. Corp. Law § 906 (noting that when a "merger or consolidation has been effected," the

surviving or consolidated corporation "possess[es] all the rights, privileges, immunities, powers and purposes of each of the constituent corporations"). Defendants do not dispute Plaintiffs' interpretation of German law, but argue that the documents submitted in support of the assertion do not contain any language explicitly assigning tort claims. (Def. Reply (Dkt. No. 15) at 6)

Based on the current record, it appears that the Sachsen LB Certificate is governed by German law. Per the terms of the GMRA, English law appears to govern the LAAM X Trust Certificate. Under the Sale and Purchase Agreement between Spencerview and Sachsen LB Europe, Irish law appears to govern the Sachsen LB Europe Certificate. Given the parties' failure to address choice of law issue, the Court cannot rule as to what law applies, nor can it issue a definitive ruling as to standing. These matters must await further briefing.

For purposes of the instant motion to dismiss, LBBW has provided sufficient information to demonstrate standing. The Complaint alleges – and the documents proffered by Plaintiffs confirm – that LBBW acquired Sachsen LB and Sachsen LB Europe, assumed all claims and liabilities of each, and transferred some of the Certificates previously held by Sachsen LB Europe to Spencerview. Based on the allegations in the Complaint, it appears that LBBW acquired the right to sue on all of the Certificates by virtue of its acquisition of Sachsen LB and Sachsen LB Europe. As to Spencerview, its standing may be academic. If Spencerview lacks standing, then presumably Plaintiff LBBW – as successor-in-interest to Sachsen LB Europe – would have retained the right to sue on the Certificate currently held by Spencerview.

Because jurisdictional issues may be raised at any point during litigation, see Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 278 (1977), Defendants may renew their standing argument at summary judgment. See In re Countrywide Fin. Corp. Mortgage-backed Sec. Litig., 943 F. Supp. 2d 1035, 1053 (C.D. Cal. 2013) (citing and quoting

14

Banque Arabe, 819 F. Supp. at 1289 ("Given this ambiguity on the face of the Assignment, it is appropriate for the Court to receive extrinsic evidence or oral testimony concerning the intention of those who were parties to the Assignment as to whether it was their intent to transfer [the] tort claims. . . .").

Defendants' motion to dismiss LBBW and Spencerview's claims for lack of standing is denied without prejudice and with leave to renew should additional information come to light during discovery that casts doubt on either entity's right to sue on the underlying claims.

## IV.   STATUTE OF LIMITATIONS

### A.   New York's Borrowing Statute

A federal court sitting in diversity applies the law of the forum in which it sits. Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  Under New York's "borrowing statute," non-resident plaintiffs must file claims in compliance with the statute of limitations of either (a) New York or (b) the jurisdiction in which the claim accrued, whichever is shorter.  N.Y. C.P.L.R. § 202.  Determining the jurisdiction in which Plaintiffs' claims accrued is therefore a critical inquiry.

New York law dictates that "a cause of action accrues at the time and in the place of the injury."  Global Fin. Corp. v. Triarc Corp., 93 N.Y.2d 525, 529 (1999).  "When an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss."  Id.; see also Appel v. Kidder, Peabody & Co., Inc., 628 F. Supp. 153, 156 (S.D.N.Y. 1986) ("Where . . . the harm claimed is economic, the loss is sustained where the economic impact of the defendant's conduct is felt, usually but not invariably at the plaintiff's place of residence.").  "If the injured party is a corporation, then the place of residence for the purposes of [the borrowing statute] is traditionally the state of incorporation or the

corporation's principal place of business." Baena v. Woori Bank, 05 CIV. 7018(PKC), 2006 WL

2935752, at *6 (S.D.N.Y. Oct. 11, 2006). Ultimately, "'the thrust of the inquiry' is 'who became

poorer, and where did they become poorer' as a result of the conduct complained of." Appel,

628 F. Supp. at 156 (quoting Maiden v. Biehl, 582 F. Supp. 1209, 1218 (S.D.N.Y. 1984)).

      Plaintiff LBBW is a German bank with its principal place of business in

Germany.  The same is true of its predecessor in interest, Sachsen LB.  (Cmplt. (Dkt. No. 6) ¶¶

19-20)  Plaintiffs Spencerview and Georges Quay are special purpose vehicles incorporated in

Ireland.  (Id. ¶¶ 22, 24)  Plaintiff Caledonian appears to be a trust organized under the laws of the

Cayman Islands.  (Id. ¶ 25)  Accordingly, at first blush, it appears that the statutes of limitations

of Germany, Ireland, and the Cayman Islands would apply to the claims made by LBBW,

Spencerview and Georges Quay, and Caledonian, respectively.

      RBS argues, however, that this Court should apply Germany's statute of

limitations to all of Plaintiffs' claims.  In support, RBS cites Lang v. Paine, Webber, Jackson &

Curtis, 582 F. Supp. 1421 (S.D.N.Y. 1984).  In Lang, the plaintiff – a Canadian resident –

brought a securities fraud action in New York based on a brokerage account he held in

Massachusetts.  582 F. Supp. at 1422.  The court decided that, because Massachusetts was the

plaintiff's "financial base," its statute of limitations, rather than Canada's, applied to the claims

at issue.  Id. at 1426.  The Lang court found the following factors relevant in determining that

Massachusetts – and not Canada – was the plaintiff's "financial base":  plaintiff's securities

purchases were made with money transferred from Canada to the United States for this specific

purpose; plaintiff's most substantial investment was made with funds transferred from his bank

account in Massachusetts; plaintiff maintained his account exclusively with a Massachusetts

branch of Paine, Webber; all trades on plaintiff's account were directed from that office; and the financial loss affected funds held by plaintiff in Massachusetts. Id.

RBS contends that because the entities that purchased the certificates at issue were owned or controlled by LBBW's German predecessor in interest, Sachsen LB, Germany is the location of the injury. (Def. Br. (Dkt. No. 12) at 9-10) According to RBS, the proper answer to the questions "who became poorer, and where did they become poorer," is Sachsen LB, not the special purpose vehicles that held the certificates or the Irish subsidiary that managed some of the investments. (Def. Reply Br. (Dkt. No.15) at 2)

Determining whether the Lang "financial base" exception applies requires a detailed factual inquiry. The Lang court cited Sack v. Low, 478 F.2d 360 (2d Cir. 1973) for the proposition that a "court can consider how plaintiff paid for [the] securities, where plaintiff maintained accounts, and other factors relevant to how [the] securities were handled in determining where [the] cause of action arose under [the] traditional [place of injury] test." 582 F. Supp. at 1426. In Sack, plaintiffs argued that their securities fraud action arose in New York, even though they were Massachusetts residents who were acting as trustees for a Massachusetts trust. The court remanded for additional fact-finding, noting that, while "unlikely," it was possible that plaintiffs could establish that their cause of action arose in New York. Sack, 478 F.2d at 368.

Further development of the factual record is necessary to determine whether Germany should be considered the locus of all of Plaintiffs' injuries. The Complaint is scant on details regarding the method of payment for the certificates; the location of accounts from which payment was made; the presence or absence of employees making investment decisions for or on behalf of the Plaintiffs in the relevant jurisdictions; and the specific ownership structures of, and

financial relationships among, the Plaintiffs.  The factual record necessary to make a determination as to the locus of Plaintiffs' injury must be developed during discovery.

**B.**     **The German Statute of Limitations**

While it is unsettled whether Germany's three-year statute of limitations will apply to all of Plaintiffs' claims, the parties agree that Germany's three-year statute governs Plaintiff LBBW's claims.  The parties disagree, however, as to the proper application of German law, and have submitted competing expert opinions on the issue.

Defendants argue that, under German law, all of the Plaintiffs' claims are time-barred.  Under German law, the statute of limitations begins to run on December 31 of the year in which a plaintiff obtains notice of its fraud claim.  (Dr. Klaus-A. Gerstenmaier Declaration ("Decl.") (Dkt. No. 16) ) ¶¶ 24-29)  Because "Plaintiffs obtained or should have obtained notice of their claims" at some point in 2008, the statute of limitations began to run on December 31 of that year.  (Def. Br. (Dkt. No. 12) at 11)  Defendants cite to various news reports and lawsuits, downgrades of Plaintiffs' certificates, and monthly performance reports sent to Plaintiffs in support of their argument that Plaintiffs had notice of their claims in 2008.  (Id. at 12-15)

Plaintiffs contend, however, that their claims are not time-barred under German law because "the three-year period does not begin to run until the end of the year in which a plaintiff obtains knowledge, or would be grossly negligent not to have obtained knowledge, of facts sufficient to disclose (1) the identity of potential defendants, (2) the nature and existence of the fraud, and (3) the defendants' intent."  (Pltf. Br. (Dkt. No. 18) at 7 (citing Prof. Dr. Heinz-Peter Mansel Decl. (Dkt. No. 20) ¶¶ 5-9, 12)  Plaintiffs argue that Defendants have not demonstrated that they had knowledge of their claims, or were grossly negligent in not knowing of their claims, in 2008.

The parties also disagree about the German standard for gross negligence, particularly as applied to a corporation.  While Plaintiffs contend that "German law sets a high bar to start the three-year clock" (Pltf. Br. (Dkt. No. 18) at 7), Defendants claim that the declaration of Plaintiffs' German law expert, Professor Dr. Heinz-Peter Mansel, overstates the gross negligence standard, particularly as applied to business organizations.  (Reply Br. (Dkt. No. 15) at 3)

"Limitations-based arguments in RMBS fraud actions have not generally been accepted at the motion to dismiss phase." HSH Nordbank AG v. The Goldman Sachs Group, Inc., No. 652991/2012, slip op. at 4 (Sup. Ct. Dec. 3, 2013) (citing Capital Vultures Intern. v. J.P. Morgan Mortgage Acquisition Corp., CIV.A. 12-10085-RWZ, 2013 WL 535320, at *7 (D. Mass. Feb. 13, 2013); In re Countrywide Fin. Corp. Mortgage-Backed Secs., 2:11-ML-02265-MRP, 2012 WL 1322884, at *4 (C.D. Cal. Apr. 16, 2012); Allstate Ins. Co. v. Morgan Stanley, No. 651840/2011, 2013 WL 2369953, at *9 (N.Y. Sup. Ct. 2013)).  Prospective fraud plaintiffs often "have a difficult task in obtaining sufficient notice of the facts underlying their claims." Id. at 4-5 (citing In re Countrywide, 2012 WL 1322884, at *4).

Based on the present record, this Court cannot conclude as a matter of law that Plaintiffs were put on notice of their claims in 2008.  As evidence that Plaintiffs knew or should have known of their claims, Defendants point to media reports, ratings downgrades, monthly reports showing spikes in delinquencies in the underlying mortgages of the securitizations at issue, RMBS lawsuits, and the known economic losses on the Certificates.  (Def. Br. (Dkt. No. 12) at 12-15; Reply Br. (Dkt. No. 15) at 4)  Even assuming, arguendo, that German law requires a plaintiff to monitor foreign news and litigation, it does not follow that Plaintiffs were or should have been on notice of their fraud claims. See Allstate, 2013 WL 2369953, at *9 ("The collapse

of the various loan originators . . . would not necessarily apprise plaintiffs that Morgan Stanley was complicit in their wrongdoing."). The information cited by Defendants is not necessarily indicative of misrepresentation or scienter, two key elements of Plaintiffs' fraud claim. See, e.g., Capital Ventures Intern., 2013 WL 535320, at *7 (poor performance would not necessarily alert plaintiff to the alleged abandonment of underwriting standards).

A determination as to when Plaintiffs knew or were grossly negligent in not knowing about their claims must await the development of a more complete factual record.[3]

## V.    SCIENTER

As to Plaintiff's common law fraud claims, Fed. R. Civ. P. 9(b) requires Plaintiffs to "(1) specify the statements that they contend were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner, 459 F.3d at 290-91. Plaintiffs' allegations must give rise to a strong inference of scienter, S.Q.K.F.C., Inc., 84 F.3d at 634, which "'may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" Lerner, 459 F.3d at 290-91 (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d. Cir. 1994)).

The Complaint alleges that Defendants made fraudulent representations in connection with (1) underwriting guidelines; (2) LTV and CLTV ratios; (3) owner-occupancy rates; (4) credit ratings; and (5) proper assignment of mortgages. Plaintiffs do not argue that Defendants had a motive to make fraudulent misrepresentations "beyond a general profit motive common to all corporations, which does not suffice." Deutsche Zentral-Genossenschaftsbank AG

---

[3] The Court need not address Defendants' argument that Plaintiffs' negligent misrepresentation claim is time-barred, as that claim will be dismissed on other grounds. See Part VIII infra.

v. HSBC North America Holdings, Inc., No. 12 Civ. 4025(AT), 2013 WL 6667601, at *19

(S.D.N.Y. Dec. 17, 2013) (citing Novak v. Kasaks, 216 F.3d 300, 307 (2d. Cir. 2000)).  They do

argue, however, that sufficient circumstantial evidence exists to give rise to a strong inference of

"conscious misbehavior or recklessness."  (Pltf. Br. (Dkt. No. 18) at 32)

### A.    Abandonment of Underwriting Guidelines

In their Offering Materials, Defendants represented that the loans underlying their

mortgage securitizations either conformed with originators' underwriting guidelines or possessed

sufficient "compensating factors" to justify inclusion in the securitizations.  Defendants also

represented that they would perform their own, redundant due diligence review of loans made by

the originators.  (Cmplt. (Dkt. No. 6) ¶¶ 76, 78)  The Complaint alleges that these representations

were misrepresentations because Defendants (1) knew that "the originators systematically

abandoned their underwriting guidelines"; and (2) ignored red flags during the due diligence

process, securitizing loans that neither complied with originators' guidelines nor had any

compensating factors.  (Id. ¶¶ 76, 82-84)

Plaintiffs contend that Defendants and their third-party due diligence vendor,

Clayton, had access to and performed due diligence on the underlying loan files and therefore

either knew or was reckless in not knowing that the originators had abandoned their underwriting

guidelines.  Plaintiffs point to a Federal Housing Finance Agency (FHFA) forensic review of

loans from SVHE 2007-OPT1, a securitization not at issue here, but apparently assembled by

most of the Defendants.  According to the FHFA, 80% of the loan files it reviewed "had not been

written within the stated guidelines, or otherwise breached Defendants' representations."  (Id. ¶

170)

Plaintiffs also rely on a report prepared by Clayton (the "Clayton Report"), summarizing the results of its due diligence reviews of more than 900,000 loans from 1st Quarter 2006 to 2nd Quarter 2007. (Id. ¶ 183)  According to the Clayton Report, RBS "waived in" – or decided to purchase and securitize – 53.3% of the loans Clayton identified as not complying with the originator's underwriting guidelines or lacking sufficient compensating factors to justify purchase. (Id. ¶ 185-87)  At least five of the seven offerings that are the subject of the Complaint were assembled during the time period covered by this report; the other two were assembled in the next two quarters of 2007. (Id. ¶ 25)

Plaintiffs also rely on the deposition of an unnamed Clayton employee – testifying in an unrelated action alleging fraud by Bear Stearns – in which the witness states that Clayton employees were urged by their supervisors – at the behest of clients – to approve loans that did not satisfy underwriting guidelines and lacked compensating factors. (Id. ¶ 190)  This was allegedly true as to all clients, including Defendants. (Id. ¶¶ 190-95)

Finally, with respect to the loans securitized in the MHL 2006-1 trust, Plaintiffs allege that, by virtue of Defendants' warehouse lending arrangement with MortgageIT, Defendants must have known that the originator had abandoned its underwriting standards, because they were permitted to conduct loan review on-site. (Id. ¶¶ 196-201)

The Court concludes that Plaintiffs have sufficiently alleged that Defendants "knew facts or had access to information suggesting that their public statements were not accurate." F. Hous. Fin. Agency v. JPMorgan Chase & Co., 902 F. Supp. 2d 476, 491 (S.D.N.Y. 2012) (citing ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 199 (2d. Cir. 2009)).  Plaintiffs' allegations also raise a strong inference that Defendants either knew or were reckless in not knowing that their Offering Materials falsely

22

stated that the loans comprising the securitizations at issue met originators' underwriting guidelines.

In JPMorgan Chase, 902 F. Supp. 2d at 491-93, the court found a strong inference of scienter on nearly identical facts.  While Defendants argue (Def. Br. (Dkt. No. 12) at 34 n.40) that JPMorgan Chase is distinguishable – because a JPMorgan affiliate was an originator for a number of the securitizations at issue – related FHFA suits against other defendants have been permitted to proceed even absent proof that a defendant participated in origination.  See F. Hous. Fin. Agency v. Goldman, Sachs & Co., No. 11 Civ. 6198, 2012 WL 5494923, at *2 (S.D.N.Y. Nov. 12, 2012); F. Hous. Fin. Agency v. Ally Fin. Inc., No. 11 Civ. 7010, 2012 WL 6616061, at *2-3 (S.D.N.Y. Dec. 19, 2012).

Defendants also cite Landesbank Baden-Württemberg v. Goldman, Sachs & Co., 478 F. App'x 679 (2d Cir. 2012) – a non-precedential summary order – for the proposition that "an allegation that defendants had access to information that was inconsistent with their alleged misstatements 'must specifically identify the reports or statements containing this information.'" (Def. Br. (Dkt. No. 12) at 33 (quoting Landesbank Baden-Württemberg, 478 F. App'x at 682 (quoting Novak, 216 F.3d at 309)))  They argue that because Plaintiffs do not allege that the Clayton Report and the FHFA study were made available to the Defendants before the securitizations were created, these documents cannot support an inference of scienter.  Plaintiffs' scienter argument on this issue turns not on the Clayton Report and the FHFA study, however, but instead on the claim that Clayton "provided Defendants with daily reports indicating exactly how many loans both failed to conform to the underwriting guidelines and also lacked any 'compensating factors.'"  (Cmplt. ¶ 270) (emphasis added).  The Clayton Report is offered not because it was made available to Defendants, but instead because it is representative of the type

of information RBS received from Clayton on a daily basis, and of the type of due diligence that was performed on loan pools.

### B.     LTV Ratios and Owner-Occupancy Rates

Plaintiffs claim that "originators deliberately inflated their appraisals" of mortgaged properties, and that Defendants were aware of this inflation by virtue of their own due diligence. (Cmplt. (Dkt. No. 6) at 91)  Accordingly to the Complaint, these inflated appraisals led to artificially low loan-to-value (LTV) and combined loan-to-value (CLTV) ratios, which led investors to believe that the loan pools presented less risk than was actually the case.  (Id. ¶¶ 90-91)  Plaintiffs' statistical study indicates that Defendants understated the weighted average LTV ratios for the loans underlying the HVMLT 2006-12 and 2007-5 trusts by 20 and 23.5 percent, respectively.  CLTV ratios were understated by 21.9 and 23.3 percent, respectively.  For the MHL 2006-1 trust, Plaintiffs found a 6.5 percent understatement of the weighted average LTV ratio. (Cmplt. tbls. 4-6)  Plaintiffs' loan-level investigation also found that owner-occupancy rates in the HVMLT 2006-12, HVMLT 2007-5, and MHL 2006-1 trusts were overstated by 20.2, 22, and 16.1 percent, respectively.  (Cmplt. tbls. 7-8)

The Complaint does not, however, allege facts sufficient to raise a strong inference of scienter with respect to misrepresentations about LTV ratios and owner-occupancy rates.  While Plaintiffs' loan-level investigations support an inference that originators were, in fact, systematically overstating appraisal values, they do not raise a strong inference that Defendants knew about this activity.  "It is true . . . that the magnitude of inaccuracy can sometimes provide circumstantial evidence that a fraud defendant made her false statements knowingly or recklessly."  JPMorgan Chase, 902 F. Supp. 2d at 493 (citing In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 73 (2d Cir. 2001); Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir.

2000)). "Generally, however, such evidence must be supported by additional circumstantial evidence in order for the plaintiff to carry her pleading burden, particularly where the originator of the false information is a third-party." Id. (citing In re WorldCom, Inc. Sec. Litig., 02 CIV. 3288 (DLC), 2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003)).

Here, as in JPMorgan Chase, Plaintiffs have not pled sufficient facts to demonstrate that Defendants knew about the overvalued appraisals allegedly performed by the originators, or about misstatements regarding owner occupancy. See also Goldman, Sachs, 2012 WL 5494923, at *2; Ally Fin., 2012 WL 6616061, at *2-3. Although Plaintiffs allude to the due diligence that RBS and/or Clayton performed on the loans, the Complaint does not allege that the review process involved verifying appraisal values or owner occupancy. While RBS represented that its due diligence process included obtaining Broker Price Opinions ("BPOs") "on a selective basis," the Complaint does not assert that the BPOs were designed to verify past appraisals, nor that "a selective basis" review would have been sufficient to alert RBS to appraisal inaccuracy. (Cmplt. (Dkt. No. 6) ¶ 263) Although Plaintiffs imply that Defendants' due diligence process was designed not only to determine whether a loan's characteristics complied with its originator's guidelines, but also to test the veracity of the information provided by the originator, Plaintiffs have not pled facts showing that Defendants double-checked the appraisal values and owner-occupancy information provided by the originators. Because the Complaint provides no factual basis for concluding that Defendants knew that the LTV and owner-occupancy figures they gave to investors were false, Plaintiffs have not met their burden of pleading facts sufficient to raise a strong inference of scienter with respect to these categories of alleged misrepresentations.

C.      **Credit Ratings**

Plaintiffs allege that Defendants falsely represented that the investment ratings provided by credit rating agencies would be "based upon an assessment of the likelihood of delinquencies and defaults in the underlying mortgage pools." (Id. ¶ 205)  Defendants allegedly knew that these misrepresentations were false, because they knew that the information provided to the credit rating agencies – e.g., that the loans complied with originators' underwriting guidelines – was false.  To the extent that the alleged misrepresentations regarding credit ratings are based on Plaintiffs' claims that Defendants knew about originators' abandonment of underwriting guidelines, those claims adequately plead scienter.  See Fed. Hous. Fin. Agency v. Merrill Lynch & Co., 903 F. Supp. 2d 274, 282 n. 4 (S.D.N.Y. 2012) ("[G]iven the allegation that defendants provided the same false information to the rating agencies that they included in the Offering Materials, allegations tending to show recklessness with respect to the one support a similar inference with respect to the other.  Thus, plaintiff's allegations of credit-rating fraud survive insofar as they rely on the defendants' provision of false information regarding underwriting standards to the rating agencies.")  Insofar as the alleged misrepresentations involve LTV/CLTV ratios and owner-occupancy rates, the Complaint does not adequately plead scienter, for the reasons discussed above.

D.      **Mortgage and Note Transfers**

Plaintiffs also allege that the mortgage-backed securities they purchased from Defendants were not, in fact, backed by mortgages.  (Cmplt. (Dkt. No. 6) ¶¶ 207-10)  Two investigations conducted by Plaintiffs concluded that Defendants frequently did not assign the underlying mortgages and notes to the issuing trusts, contrary to their representations.  (Id. ¶¶ 233-36)  The Complaint asserts that, "[g]iven that it was Defendants' responsibility to effectuate

26

the assignments, Defendants knew that the statements were false, and that the mortgages would not be properly and timely assigned, at the time the representations were made." (Id. ¶ 220) Plaintiffs point to an unrelated investigation conducted in 2004 and 2005 which found "a similar lack of transfers of notes and mortgages" to trusts, and on that basis contend that Defendants' non-transfer practice was deliberate and pervasive. (Cmplt. ¶ 279)

These allegations are not sufficient to raise a strong inference of scienter. S.Q.K.F.C., Inc., 84 F.3d at 634. Plaintiffs do not identify the source of the 2004-2005 investigation, nor do they allege that Defendants were made aware of the results of the investigation. While Plaintiffs' investigations suggest that Defendants may not have satisfied their obligations concerning the assignment of mortgages and notes, there is little evidence that Defendants intended, at the time of making those representations, to breach them. Cf. HSH Nordbank AG v. The Goldman Sachs Group, Inc.,, No. 652991/2012, slip op. at 10 (breach of contract is proper remedy absent factual allegations that failure to assign and transfer notes and mortgages was a deliberate, premeditated practice); see also Dowlings, Inc. v. Homestead Dairies, Inc., 88 A.D.3d 1226, 1229 (3d Dept. 2011) ("Promises of future performance, alone, are insufficient to sustain a claim of fraud."). Accordingly, Plaintiffs' fraud claims regarding faulty transfer of mortgages and notes must fail.

## VI.   MATERIAL MISSTATEMENTS AND OMISSIONS

Defendants argue that Plaintiffs have not adequately alleged the materiality of (1) Defendants' failure to disclose that originators had abandoned their underwriting standards, and (2) Defendants' misrepresentations regarding credit ratings, to the extent that those alleged misrepresentations involve a failure to disclose to the credit rating agencies that originators had abandoned their underwriting standards. (See Def. Br. (Dkt. No. 12) at 19-33)

A.   **Underwriting Guidelines**

According to the Complaint, Defendants falsely represented that all loans included in their securitizations conformed with the originators' underwriting guidelines, or that sufficient "compensating factors" existed to justify their inclusion in the securitization. Plaintiffs further allege that Defendants did not disclose that "they were manipulating the [due diligence] review process to gain an increased share of the RMBS market," and that originators systematically abandoned their underwriting guidelines. According to Plaintiffs, "Defendants brushed the noncompliant loans under the rug, concealing from investors that there were substantial percentages of defective loans in the pools." (Cmplt. (Dkt. No. 6) ¶¶ 80-84)

Defendants offer several arguments as to why these statements were not materially misleading. First, they argue that because the Offering Materials disclosed that originators might make exceptions to their underwriting guidelines, Defendants did not actually misrepresent any information. Next, they argue that the inclusion in the Offering Materials of a "repurchase or substitute" provision, under which Defendants pledged to repurchase or substitute for non-compliant loans in the mortgage pool, put Plaintiffs on notice that non-compliant loans would be included in the securitized pool of mortgages. Finally, Defendants argue that Plaintiffs' allegations regarding underwriting guidelines are not sufficiently particularized, because they do not necessarily relate to the loans backing the Certificates at issue here. (Def. Br. (Dkt. No. 12) at 21-24)

Other courts have rejected Defendants' first two arguments. "Courts considering RMBS claims have overwhelmingly held that such disclosures or warnings do not give notice to investors of the defendant's 'wholesale abandonment of underwriting standards.'" Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC, 42 Misc. 3d 1220(A), 2014 WL 432458, at *8 (N.Y. Sup.

28

Ct. 2014) (listing cases) (quoting Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset

Acceptance Corp., 632 F3d 762, 773 (1st Cir. 2011)); see also Public Emps. Ret. Sys. Of Miss.

V. Merrill Lynch & Co., 714 F. Supp. 2d 475, 483 (S.D.N.Y. 2010) ("[T]he alleged repeated

deviation from established underwriting standards is enough to render misleading the assertion in

the registration statements that underwriting guidelines were generally followed."); N.J.

Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC, 709 F.3d 109, 123 (2d Cir. 2013)

(holding that district court should have allowed fraud claims to proceed where plaintiff had

provided "fairly specific" account of how originators had abandoned underwriting standards).

   Moreover, the "repurchase or substitute" provision does not assist Defendants.

The pledge to replace non-compliant loans did not give notice that originators had engaged in a

wholesale abandonment of their underwriting guidelines.  See Stichting Pensioenfonds ABP v.

Credit Suisse Grp. AG, No. 653665/2011, 2012 WL 6929336, at *8 (N.Y. Sup. Ct. Nov. 30,

2012) ("A cure provision does not change the nature of Credit Suisse's representations about

their process.").

   Defendants' assertion that there is no nexus between originators' abandonment of

sound underwriting practices and the loans in the securitized pools at issue fares no better.  "A

plaintiff need not allege that any particular loan or loans were issued in deviation from the

underwriting standards, so long as the complaint alleges 'widespread abandonment of

underwriting guidelines.'"  Emps.' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan

Chase & Co., 804 F. Supp. 2d 141, 152 (S.D.N.Y. 2011) (quoting Tsereteli v. Residential Asset

Securitization Trust 2006-A8, 692 F. Supp. 2d 387, 392 (S.D.N.Y. 2010)).  As discussed above,

Plaintiffs have offered their own statistical analysis of the loans underlying their Certificates and

found deviations from representations; the Complaint cites to an FHFA report finding substantial

deviation from underwriting guidelines in another RBS securitization; the Clayton Report found that RBS allowed a substantial number of "waive-ins" during the relevant time period; and the Complaint notes deteriorating performance and credit ratings of the Certificates at issue. These allegations are sufficient to raise an inference that the originators systematically abandoned their underwriting guidelines with respect to the loans collateralizing Plaintiffs' certificates. In not disclosing this alleged practice, the Offering Materials contained material misstatements or omissions.

**B.**   **Credit Ratings**

The Complaint alleges that "the Offering Materials represented that the ratings were based on an assessment of the likelihood of delinquencies and defaults in the underlying mortgage pools." According to Plaintiffs, these representations were false and misleading, because the credit rating agencies relied on the same allegedly false information about originators' adherence to underwriting guidelines. (Cmplt. (Dkt. No. 6) ¶¶ 202-06) Defendants argue, however, that they are not responsible for credit ratings, which reflect only the opinions of the credit rating agencies. Defendants further contend that because Plaintiffs have not alleged that they were given credit ratings that had not actually been assigned to the Certificates, there can be no misstatement. (Def. Br. (Dkt. No. 12) at 30)

Defendants' arguments are not persuasive. "'The truth of a statement made in the prospectus is adjudged by the facts as they existed when the registration statement became effective.'" In re Agria Corp. Secs. Litig., 672 F. Supp. 2d 520, 526 (S.D.N.Y. 2009) (quoting In re Flag Telecom Holdings Ltd. Sec. Litig., 308 F. Supp. 2d 249, 254 (S.D.N.Y. 2004)). Here, Defendants made the following statement in their Offering Materials: "The ratings of each rating agency take into consideration the credit quality of the related mortgage pool. . . ." (Cmplt. (Dkt.

30

No. 6) ¶ 205)  Plaintiffs claim that this statement was false and misleading, <u>at the time it was</u>

<u>made</u>, because Defendants knew, <u>inter alia</u>, that originators were not adhering to their stated

guidelines, and therefore the information rating agencies were relying on in issuing ratings was

not reliable.  Because Defendants knew that the risk presented by the underlying loans could not

be properly assessed by the rating agencies, the representation in the Offering Materials that

credit ratings reflected credit quality was false and misleading.  The Complaint sufficiently

pleads misstatements regarding credit ratings.  <u>Accord</u> <u>Stichting Pensioenfonds ABP</u>, 2012 WL

6929336, at *10 (statements regarding agencies' rating method actionable where plaintiff alleged

that Credit Suisse knew that the data given to the rating agencies was false).[4]

## VII.   <u>RELIANCE</u>

    A misrepresentation is only actionable if it (1) induces a party to act, and (2) the

party was justified or reasonable in being so induced.  <u>Allstate Ins. Co. v. Countrywide Fin.</u>

<u>Corp.</u>, 824 F. Supp. 2d 1164, 1187 (C.D. Cal. 2011).  "New York law imposes an affirmative

duty on sophisticated investors to protect themselves from misrepresentations made during

---

[4] Defendants also argue that Plaintiffs' fraud claims should be dismissed because the Complaint's use of group pleading violates Rule 9(b)'s particularity requirement.  (Def. Br. (Dkt. No. 12) at 18, 33)  In support of this argument, Defendants cite to <u>Teamsters Allied Benefit Funds v. McGraw</u>, 09 CIV. 140 (PGG), 2010 WL 882883, at 11 n.6 (S.D.N.Y. Mar. 11, 2010), a case brought under the Securities Exchange Act.  In <u>McGraw</u>, this Court noted that, where a plaintiff allege securities fraud, "[t]he group pleading doctrine cannot apply to create a presumption of scienter as to individual defendants."  <u>McGraw</u>, 2010 WL 882883, at 11 n.6 (internal quotation marks and citation omitted).  Because the Complaint here alleges common law fraud, rather than a federal securities law violation, Defendants' argument is misplaced.  <u>See</u> <u>In re Optimal U.S. Litig.</u>, 837 F. Supp. 2d 244, 263 (S.D.N.Y. 2011) (group pleading is permitted where plaintiffs state a common law fraud claim, as opposed to a federal securities law claim, and "allege interaction between the corporate entities relating to the subject matter of the alleged fraudulent misstatement or omission that is more than conclusory").  Here, the Complaint explains – at length – the role that each Defendant played in each Securitization, and how each Defendant is responsible for the alleged misrepresentations.  (Cmplt. (Dkt. No. 6) ¶¶ 27-30, 59 tbl. 2, 60-73)  These allegations are sufficient to make out a common law fraud claim.

business acquisitions by investigating the details of the transaction." Global Minerals & Metals Corp. v. Holme, 35 A.D.3d 93, 100 (1st Dept. 2006).  Where the misrepresented facts are "peculiarly within the misrepresenting party's knowledge," however, reliance is justifiable. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 785 (2d Cir. 2003).  "[B]ecause justifiable reliance 'involve[s] many factors to consider and balance, no single one of which is dispositive,' it is 'often a question of fact for the jury rather than a question of law for the court.'"  JPMorgan Chase, 902 F. Supp. 2d at 496 (quoting STMicroelectronics, N.V. v. Credit Suisse Securities (USA) LLC, 648 F.3d 68, 81 (2d Cir. 2011)).

   Plaintiffs contend that they relied on (1) the Offering Materials provided by the Defendants; (2) term sheets, and (3) free writing prospectuses (FWPs).[5]  The term sheets and FWPs pre-dated the publicly filed Prospectus Supplements, but contain "nearly identical information," including data about the loan pool, expected credit ratings, and the identity and quality of the originator.  (Cmplt. (Dkt. No. 6) ¶¶ 297-98)  The Complaint asserts that Sachsen LB Europe conducted a multi-phase investment process, which relied heavily on the information contained in the term sheets, FWPs, and Prospectus Supplements, and culminated in a Credit Risk Assessment, which detailed the investment's risks and contained a recommendation.  (Id. ¶¶ 299-302)  AC Capital, which served as the investment manager for LAAM I, II, X, and XI, reviewed the same materials and determined whether the Certificates met their investment guidelines.  (Id. ¶¶ 303-06)  The Complaint contends that Plaintiffs' reliance on Defendants' representations was reasonable, because Plaintiffs' review and analysis could not have uncovered

---

[5] A free writing prospectus is a written communication "that constitutes an offer to sell or a solicitation of an offer to buy the securities relating to a registered offering that is used after the registration statement in respect of the offering is filed . . . and is made by means other than (1) a prospectus satisfying the requirements of section 10(a) of the [Securities] Act." 17 CFR § 230.405.

the fact that originators were systematically abandoning their underwriting guidelines. (Id. ¶ 312)

       Defendants argue, however, that the Complaint does not plead facts showing justifiable reliance. First, Defendants claim that – because Plaintiffs purchased at least six of the Certificates before the relevant prospectus supplement was made public – they could not reasonably have relied on any representations made by Defendants. In other words, Plaintiffs could not have reasonably relied on the term sheets or FWPs provided to them pre-purchase. This argument has been rejected. See Fed. Hous. Fin. Agency v. Deutsche Bank AG, 903 F. Supp. 2d 285, 289 (S.D.N.Y. 2012) (noting that information incorporated into prospectus supplements was identical to information included in the preliminary materials provided to plaintiffs). Here, as in Deutsche Bank AG, Plaintiffs allege that the term sheets and FWPs contained the same representations as the Prospectus Supplements. Accordingly, their "allegations regarding the falsity of the Prospectus Supplements are . . . sufficient to plead the falsity of overlapping information in the Preliminary Materials as well." Id.

       Defendants also contend that Plaintiffs' failure to specify the persons who read and relied on their alleged misrepresentations is fatal to their claim. The one case Defendants cite in support of this argument – Devaney v. Chester, 709 F. Supp. 1255, 1264 (S.D.N.Y. 1989) – is not on point. In that case – after four amended complaints and extensive discovery – the court dismissed plaintiff's action because of his inability to specify who had read and relied on a written statement allegedly made by the defendant. Id. Here, by contrast, there has been no discovery, and Plaintiffs have identified the entities involved in making investment decisions regarding the Certificates. The Complaint is sufficiently particularized.

Defendants also argue that – given Plaintiffs' financial sophistication – their failure to review loan tapes for each of the offerings is incompatible with a finding of justifiable reliance.[6] According to Defendants, loan tapes were available to investors and were on file with the SEC, and Plaintiffs' alleged "decision not to consider all the available information precludes [their] claims of justifiable reliance." (Def. Br. (Dkt. No. 12) at 38-39) Plaintiffs have alleged, however, that the loan tapes would not have provided sufficient information to alert investors to a fraud, because the data reflected in the loan tapes was false; to uncover the fraud, an investigation into the veracity of the information contained in the individual loan files would have been necessary. (Cmplt. (Dkt. No. 6) ¶ 314)

Plaintiffs were not required to conduct such an investigation. In JPMorgan Chase, the court noted that "even in the face of knowledge that many of the originators supplying loans to these securitizations engaged in dubious underwriting practices, 'the [government-sponsored enterprises] were entitled to rely on defendants' assertion that the loans that underlay these particular securities complied with the guidelines set out in the offering materials.'" JPMorgan Chase, 902 F. Supp. 2d at 497 (quoting Fed. Hous. Fin. Agency v. UBS Americas, Inc., 858 F. Supp. 2d 306, 321 (S.D.N.Y. 2012)).

In any event, the Complaint alleges that Plaintiffs performed extensive due diligence before purchasing the Certificates, including analyzing "the quality of the collateral" (including average FICO scores, LTV ratios, and occupancy type), the anticipated credit ratings, and the quality of the originators and servicers. (Cmplt. (Dkt. No. 6) ¶¶ 300-06) Given that sophisticated plaintiffs are not required to "conduct their own audit" in order to rely on a

---

[6] Loan tapes are spreadsheets created by originators that contain loan data. (Cmplt. ¶ 177)

defendant's allegedly fraudulent representations, <u>DDJ Mgmt., LLC v. Rhone Group LLC</u>, 15

N.Y.3d 147, 156 (2010), Plaintiffs have alleged sufficient facts to plead justifiable reliance.

       Defendants also contend, however, that Plaintiffs have not pled loss causation,

because they have not alleged "facts 'which, if proven, would show that [their losses were]

caused by the alleged misstatements as opposed to intervening events.'" (Pltf. Br. (Dkt. No. 12)

at 39)  This argument has been rejected by numerous courts in other RMBS cases.  <u>See</u>, <u>e.g.</u>,

<u>MBIA Insurance Co. v. Countrywide Home Loans, Inc.</u>, 87 A.D.3d 287, 296 (1st Dept. 2011)

("It cannot be said, on this pre-answer motion to dismiss, that MBIA's losses were caused, as a

matter of law, by the 2007 housing and credit crisis."); <u>Dexia Holdings, Inc. v. Countrywide Fin.</u>

<u>Corp.</u>, 2:11-CV-07165-MRP, 2012 WL 1798997, at *6 (C.D. Cal. Feb. 17, 2012) ("The link

between a risk of default and a Certificate's value is indisputable and provides sufficient causal

nexus to survive a motion to dismiss. . . . Untangling the effect of the alleged misrepresentations

from the effects of the broader financial crisis will present a complicated issue of fact.  It is

therefore better saved for a more complete factual record.")  Here, Plaintiffs have adequately

alleged that the drop in the Certificates' value was caused by Defendants' misstatements in the

Offering Materials, and that the Certificates' value would have been much higher –

notwithstanding the collapse in the housing market – had Defendants not committed fraud.

(Cmplt. (Dkt. No. 6) at ¶¶16, 318)  These allegations satisfy Plaintiffs' minimal burden at this

stage.

       Finally, Defendants contend that Plaintiffs do not – and cannot – allege

cognizable damages, because they have not sold the Certificates on which their claim is based

and, in fact, continue to receive underlying interest payments on the Certificates.  (Pltf. Br. (Dkt.

No. 12) at 4)  In making this argument, Defendants misapprehend New York law.  Under New

York law, fraud damages equal the difference between the price paid for an asset and its true value as of the date of the sale. Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 183 (2d Cir. 2007); see also NECA-IBEW Health & Welfare Fund v. Goldman Sachs Co., 693 F.3d 145, 166 (2d Cir. 2012) ("[B]asic securities valuation principles . . . belie the proposition that a fixed income investor must miss an interest payment before his securities can be said to have declined in 'value.' The reasonable inference from [plaintiff's] allegations is that, because the loans backing the Certificates were riskier than defendants represented, the future cash flows to which [plaintiff] was entitled . . . required a higher discount rate once the Offering Documents' falsity was revealed, resulting in a lower present value."). Plaintiffs have adequately alleged that the Certificates are worth far less than they paid for them and that their true value would have been much lower at the time of sale had RBS disclosed, inter alia, that originators had systematically abandoned their underwriting standards. See Cmplt. (Dkt. No. 6) ¶¶ 16, 316, 319-21; see also Allstate Ins. Co. v. Ace Securities Corp., No. 650431/2011, slip op. at 28 (N.Y. Sup. Ct. Mar. 14, 2013) ("While defendants assert that the proper measure of damages is the difference between the price paid for a security and its true worth at the time of purchase, it is easily inferable from the pleadings that plaintiffs paid an inflated price for the RMBS and are thus [] entitled to recover for the impermissible premium they paid.") Accordingly, Defendants' motion to dismiss for failure to plead cognizable damages will be denied.

## VIII.   NEGLIGENT MISREPRESENTATION AND FRAUDULENT CONCEALMENT

"A claim for negligent misrepresentation requires the plaintiff to allege: '(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable

reliance on the information.'" HSH Nordbank AG v. Barclays Bank PLC, 42 Misc. 3d 1231(A),

2014 WL 841289, at *22 (N.Y. Sup. Ct. 2014) (quoting Mandarin Trading Ltd. v. Wildenstein,

16 N.Y.3d 173, 180 (2011)).  "A cause of action for fraudulent concealment requires proof of the

elements of fraud based on a misrepresentation . . . as well as 'an allegation that the defendant

had a duty to disclose material information and that it failed to do so.'" Id. (quoting P.T. Bank

Cent. Asia v. ABN AMRO Bank N.V., 301 A.D.2d 373, 376 (1st Dept. 2003)).  "A fraudulent

concealment claim must be based on a 'special relationship or fiduciary obligation.'" Id.

(quoting Gomez-Jimenez v. New York Law Sch., 103 A.D.3d 13, 18 (1st Dept. 2012), leave to

appeal denied, 20 N.Y.3d 1093 (2013)).

        Plaintiffs have not alleged facts demonstrating the special relationship necessary

to sustain actions for negligent misrepresentation and fraudulent concealment.  The parties here

are "sophisticated entities [who were] engaged in an arm's length transaction." Id.  Based on the

allegations in the Complaint, no special relationship – fiduciary or otherwise – existed between

them.  Although Plaintiffs argue that the "special facts doctrine" applies, and that it imposed a

duty on Defendants to disclose because of their "superior knowledge of essential facts" (Pltf. Br.

(Dkt. No. 18) at 43), they have not cited any case involving RMBS in which a negligent

misrepresentation or fraudulent concealment claim has been permitted to proceed on this theory.

Indeed, New York courts routinely dismiss such claims.  See HSH Nordbank AG v. Barclays

Bank PLC, 2014 WL 841289, at *22 ("Plaintiffs do not allege the special or fiduciary

relationship necessary to support either a negligent misrepresentation or fraudulent concealment

claim."); MBIA Ins. Corp., 87 A.D.3d at 297 ("Because MBIA has failed to allege facts showing

that these sophisticated commercial entities engaged in anything more than an arm's length

business transaction, the negligent misrepresentation claim was properly dismissed."); HSH

Nordbank AG v. The Goldman Sachs Group, Inc., No. 652991/2012, slip op. at 14 (N.Y. Sup.

Ct. Dec. 3, 2013) ("Goldman Sachs's exclusive access to the underlying loan files does not

constitute the type of unique or specialized knowledge necessary to state such a claim.").

Accordingly, Plaintiffs' negligent misrepresentation and fraudulent concealment claims will be

dismissed.

IX.   **AIDING AND ABETTING FRAUD**

   Plaintiffs assert a cause of action against Defendant RBS Securities for aiding and

abetting the alleged fraud committed by Defendants RBS Acceptance and RBS Financial.

(Cmplt. (Dkt. No. 6) ¶¶ 345-50)  To state a claim for aiding and abetting fraud, Plaintiffs must

allege "(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the

aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the

fraud." Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co., 64 A.D.3d 472, 476

(1st Dept. 2009).

   Defendants argue that this claim should be dismissed because (1) RBS Securities

is named as a principal in the fraud count and "obviously cannot aid and abet [itself];" (2)

Plaintiffs fail to adequately plead RBS Securities' knowledge; and (3) the Complaint does not

"separately identify those acts which constituted substantial assistance and those which

constituted the primary violation."  (Def. Br. (Dkt. No. 12) at 40-41)

   Defendants' arguments are not persuasive.  First, the Complaint does not claim

that RBS Securities aided and abetted its own fraud.  Rather, it alleges that "RBS Securities

delivered the Offering Materials prepared by the Sponsor and Depositor Defendants that

contained the false statements."  (Cmplt. (Dkt. No. 6) at ¶ 346)  Such an act would be sufficient

to show "substantial assistance."  Second, "a plaintiff alleging an aiding-and-abetting fraud claim

may plead actual knowledge generally, particularly at the prediscovery stage, so long as [fraudulent] intent may be inferred from the surrounding circumstances." <u>DDJ Mgmt., LLC v. Rhone Grp., LLC</u>, 78 A.D.3d 442, 443 (1st Dept. 2010)  Here, the Complaint sets forth allegations as to each RBS Defendant's role in the securitization process and the preparation of Offering Materials.  (Cmplt. (Dkt. No. 6) ¶¶ 60-73)  It also alleges that "RBS Securities had actual knowledge that the statements in the Offering Materials concerning credit quality of the underlying loans for all Trusts . . . were false," and that its knowledge "is directly inferable from its substantial involvement in the securitization process, and the fact that many of the top executives of RBS Acceptance were also high-ranking employees of RBS Securities."  (<u>Id.</u> ¶ 347)  Plaintiffs' allegations are sufficient at this stage.[7]  Defendants' motion to dismiss the aiding-and-abetting claim is denied.

## X.    <u>RESCISSION BASED ON MUTUAL MISTAKE</u>

Plaintiffs allege a cause of action for rescission based upon mutual mistake.  They contend that if RBS Securities was unaware of the alleged failures to transfer title to the trusts, "then a mutual mistake of material fact existed at the time of contract, and the transactions are void."  (Cmplt. (Dkt. No. 6) ¶ 365)  The mutual mistake, then, would be that the Offering Materials provided for "an investment in trusts that actually owned residential mortgages and underlying promissory notes at the time of investment," when, in reality, they would not.  (<u>Id.</u> ¶ 363)

---

[7] Defendants also argue that the aiding-and-abetting claim must be dismissed because Plaintiffs have not delineated what acts constitute substantial assistance and what acts are primary violations.  Defendants have not demonstrated that it is erroneous – at this stage of the proceedings – to permit Plaintiffs to proceed on both theories of liability.  As discussed above – if the allegations in the Complaint are true – there is a basis for aiding and abetting liability.

Plaintiffs' rescission claim fails because the statements regarding title transfer in the Offering Materials were forward looking in that they contemplated Defendants' future obligations under the contracts.  "The doctrine of mutual mistake affords equitable relief only where the parties were mistaken as to facts <u>existing</u> at the time the contract was entered into." <u>Raphel v. Booth Mem'l Hosp.</u>, 67 A.D.2d 702, 703 (2d Dept. 1979) (emphasis in original). Although Plaintiffs claim that the Complaint alleges that Defendants represented that, "at the time the Certificates were purchased, all of the mortgages had been assigned to the Trusts. . . ." (Def. Br. (Dkt. No. 18) at 45), that misrepresents the Complaint's allegations.  <u>See</u>, <u>e.g.</u>, Cmplt. (Dkt. No. 6) ¶ 213 ("Defendants represented that the depositor <u>would</u> properly and timely transfer the notes and mortgages. . . .") (emphasis added); <u>id.</u> ¶ 214 ("Defendants also <u>promised</u> to deliver the promissory notes to the Trustees. . . .") (emphasis added).  Indeed, Plaintiffs' primary argument is that Defendants knew "that the mortgages would not be properly and timely assigned, at the time the representations were made." (<u>Id.</u> ¶ 220)  Because Plaintiffs' allegations about title transfer are based on forward-looking statements, Plaintiffs have not pled mutual mistake as to a then-existing fact.  Accordingly, Plaintiffs' cause of action for rescission based on mutual mistake will be dismissed.

## CONCLUSION

It is for the reasons stated above that this Court issued the March 31, 2014 order (Dkt. No. 27) denying Defendants' motion to strike under Fed. R. Civ. P. 12(f), denying Defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(1), and granting in part, and denying in part, Defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6).

The Court will conduct a Rule 16 conference in this matter on **April 17, 2014**, at **11:00 a.m.** in Courtroom 705 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York.  Pursuant to the Court's Individual Rules of Practice in Civil Cases, the parties are directed to submit a joint letter and proposed Case Management Plan to the Court by **April 15, 2014**.

Dated:  New York, New York          SO ORDERED.
      April 9, 2014

_Pauls Gardephe_
Paul G. Gardephe
United States District Judge

41